581 N.W.2d 876 (1998)
255 Neb. 1
In re Complaint Against Richard M. JONES, County Court Judge of the Fourth Judicial District of the State of Nebraska.
STATE of Nebraska ex rel. COMMISSION ON JUDICIAL QUALIFICATIONS, Relator,
v.
Richard M. JONES, Respondent.
No. S-35-970001.
Supreme Court of Nebraska.
July 17, 1998.
*880 Don Stenberg, Attorney General, Barry Waid, and Terri M. Weeks for relator.
David L. Herzog, Omaha, for respondent.
WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.
PER CURIAM.
This is an original proceeding before this court following a complaint filed by the Nebraska Commission on Judicial Qualifications on October 21, 1997. The complaint charges the respondent, Richard M. Jones, a county court judge for the Fourth Judicial District, *881 with seven counts of misconduct, in violation of various provisions of the Nebraska Code of Judicial Conduct and Neb.Rev.Stat. § 24-722(6) (Reissue 1995). The complaint was amended in December 1997 to add an eighth count.
A hearing on the complaint was conducted in January 1998. In accordance with Neb. Const. art. V, § 30, and Neb.Rev.Stat. § 24-721 (Reissue 1995), this court appointed the Honorable William D. Blue, a retired district court judge, to serve as special master over the hearing for the purposes of taking evidence and making recommended findings of fact and conclusions of law. The special master concluded that five of the counts were supported by clear and convincing evidence, that the conduct violated various provisions of the Code of Judicial Conduct, and that the conduct brought the judicial office into disrepute, as prohibited by § 24-722(6). However, the special master concluded that three counts were not supported by clear and convincing evidence.
The commission concluded that two of the three counts rejected by the special master were supported by clear and convincing evidence and were in violation of provisions of the Code of Judicial Conduct and § 24-722(6). The commission adopted the remaining conclusions of the special master and recommended that Jones be removed from office. Jones filed a petition with this court, asking that the commission's recommendation be modified or rejected.

I. STANDARD OF REVIEW
The standard of review is de novo on the record of the proceedings before the special master. In re Complaint Against Empson, 252 Neb. 433, 562 N.W.2d 817 (1997). In its discretion, this court may permit the introduction of additional evidence. In re Complaint Against Kneifl, 217 Neb. 472, 351 N.W.2d 693 (1984).
Neb. Const. art. V, § 30(1), and § 24-721 provide that if the commission finds the charges are established by clear and convincing evidence, it shall recommend appropriate disciplinary sanctions to this court. Therefore, we may concern ourselves only with the counts the commission concluded were established by clear and convincing evidence. See In re Complaint Against Kneifl, supra.

II. APPLICABLE STATUTORY AND JUDICIAL CODE OF CONDUCT PROVISIONS
Upon its independent inquiry, this court must determine whether the charges against the respondent are supported by clear and convincing evidence and which, if any, canons of the Code of Judicial Conduct adopted by this court and subsections of § 24-722 have been violated. If violations are found, this court must then determine what discipline, if any, is appropriate under the circumstances. See, In re Complaint Against Empson, supra; In re Complaint Against Kelly, 225 Neb. 583, 407 N.W.2d 182 (1987).
The complaint relies on § 24-722, which provides:
A Justice or judge of the Supreme Court or judge of any court of this state may be reprimanded, disciplined, censured, suspended without pay for a definite period of time not to exceed six months, or removed from office for ... (6) conduct prejudicial to the administration of justice that brings the judicial office into disrepute ....
Other than alleging violations of § 24-722(6), the complaint does not allege that Jones violated any other subsection of § 24-722.
The canons of the Code of Judicial conduct relevant to the instant matter are as follows:
CANON 1
A Judge Shall Uphold the Integrity and Independence of the Judiciary
A. An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved. The provisions of this Code shall be construed and applied to further that objective.

*882 CANON 2
A Judge Shall Avoid Impropriety and the Appearance of Impropriety in all of the Judge's Activities
A. A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
B. A judge shall not allow family, social, political or other relationships to influence the judge's judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge. A judge shall not testify voluntarily as a character witness.
....
CANON 3
A Judge Shall Perform the Duties of Judicial Office Impartially and Diligently
....

B. ADJUDICATIVE RESPONSIBILITIES.
....
(3) A judge shall require order and decorum in proceedings before the judge.
(4) A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, and of staff, court officials and others subject to the judge's direction and control.
....
(7) A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law. A judge shall not initiate, permit or consider ex parte communications or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding ....
....

C. ADMINISTRATIVE RESPONSIBILITIES.
(1) A judge shall diligently discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration, and should cooperate with other judges and court officials in the administration of court business.
(2) A judge shall require staff, court officials and others subject to the judge's direction and control to observe the standards of fidelity and diligence that apply to the judge and to refrain from manifesting bias or prejudice in the performance of their official duties.
The Code of Judicial Conduct demands that judges conform to a higher standard of conduct than is expected of lawyers and other persons in society. In re Complaint Against Empson, 252 Neb. 433, 562 N.W.2d 817 (1997).
The object of the Code of Judicial Conduct is to delineate what conduct should be avoided for its prejudicial potential. Therefore, a clear violation of the Code of Judicial Conduct constitutes, at a minimum, a violation of § 24-722(6).

III. DISCUSSION
On November 7, 1997, this court, exercising its inherent power, issued an order suspending Jones from his judicial office with pay until further order.
Neb. Const. art. V., § 30(3), states:
Upon order of the Supreme Court, a Justice or Judge of the Supreme Court or other judge shall be disqualified from acting as a Justice or Judge of the Supreme Court or other judge, without loss of salary, while there is pending (a) an indictment or information charging him or her in the United States with a crime punishable as a felony under Nebraska or federal law or (b) a recommendation to the Supreme Court by the Commission on Judicial Qualifications for his or her removal or retirement.
*883 Article V, § 30, states only these two instances when a judge shall be suspended with pay. Thus, article V, § 30, does not limit suspension with pay to only the two instances listed. This court has always had an existing inherent authority over the inferior courts. Nothing in article V, § 30, acts to revoke or limit that authority. See, In the Matter of Ferguson, 304 S.C. 216, 403 S.E.2d 628 (1991) (stating Supreme Court has inherent power to protect itself and public through order of suspension); In re Kirby, 350 N.W.2d 344 (Minn.1984) (stating when Supreme Court came into existence, it came with inherent powers); In re Franciscus, 471 Pa. 53, 369 A.2d 1190 (1977) (providing historical background for Supreme Court's inherent power over inferior courts).
Neb. Const. art. V, § 1, states in part that "[i]n accordance with rules established by the Supreme Court and not in conflict with other provisions of this Constitution and laws governing such matters, general administrative authority over all courts in this state shall be vested in the Supreme Court and shall be exercised by the Chief Justice."
This court has a duty to prevent the appearance of impropriety in the conduct of judicial business by a judge charged with misconduct while a final determination of the allegations against that judge is pending. See Matter of Benoit, 487 A.2d 1158 (Me. 1985). In adhering to this duty, an exercise of this court's inherent power over the state's lower tribunals may be necessary while the complaint is pending. See In re Kirby, supra (stating that based upon nature and seriousness of complaint, Supreme Court may suspend judge with pay in order to protect integrity of judicial system).
An order of suspension is not a disciplinary measure or final determination as to the rights of the judge in question to hold office. Rather, the sole purpose of such an order is to maintain the integrity of the judicial system for the protection of the people of the state. See In re Franciscus, supra. Such a suspension would end if the judge in question was exonerated of the allegations against him or her.
In the instant case, this court executed its order suspending Jones with pay only after Jones filed his answer to the complaint in which he admitted many of the allegations made against him. At that point, we determined it was necessary to protect the integrity of the court to suspend Jones with pay pending a determination of the allegations against him.
The suspension of Jones from office with pay was not a disciplinary action and did not reach any conclusions regarding the ultimate outcome of the proceedings against Jones. Accordingly, we now address the merits of the complaint and recommendation of the commission.

1. COUNT 1: BATTERY
Count 1 of the complaint alleges, "On or about August 11, 1994, Jones was riding in an elevator with Judge Jane Prochaska... from the employee parking lot of the Douglas County Courthouse and pressed and rubbed up against Prochaska's body, including her breasts. As Jones left the elevator, he said `fuck you' to Prochaska ."
The complaint also alleges that sometime between August 12, 1994, and August 11, 1995, Jones rammed Judge Jane Prochaska with his elbow, shoving her into the corner of the elevator and causing her to stumble.
The special master concluded that the allegations of battery were not proved by clear and convincing evidence. However, the special master did not make any conclusions regarding the allegation that Jones used intemperate language during one of the incidents. Prochaska testified that as she exited the elevator following the alleged battery, she heard Jones say "fuck you" as the doors were closing and that she also heard the word "bitch." According to Jones, Prochaska called him names during the incident. The commission adopted the findings of the special master that the alleged battery was not proved by clear and convincing evidence, but found by clear and convincing evidence that the intemperate language was intentionally spoken, in violation of Canons 1, 1A, 2, 2A, and 3B(4) of the Code of Judicial Conduct, and that such conduct is prejudicial to the administration of justice as prohibited by § 24-722(6).
*884 We agree with the commission that the use of intemperate language did occur and that such a conclusion is supported by clear and convincing evidence in the record. We further adopt the findings of the commission regarding the violations of Canons 1, 1A, 2, 2A, and 3B(4) of the Code of Judicial conduct and § 24-722(6) in that Jones' conduct was prejudicial to the administration of justice.

2. COUNT 2: BEHAVIOR TOWARD JUDGE MARK ASHFORD
Count 2 states the following allegations:
Sometime in 1991, Jones placed an anonymous note in the courthouse mail slot of Judge Mark Ashford ... which threatened Ashford. Ashford believed the letter was a serious threat and turned the matter over to the police, who later determined the letter was a hoax.
... In late 1992 or early 1993, Jones set off firecrackers in Ashford's office in the Douglas County Courthouse, during working hours.
Judge Mark Ashford testified that 6 or 7 years prior, a death threat had been left in his mail slot at work. Believing the author to be a person he prosecuted years ago and had recently seen in court, Ashford took the note seriously and gave it to the police. As a result, there was a police investigation and, for a short time, police surveillance of Ashford's home. Several days later, Jones admitted to Ashford that he had written the note and apologized. Ashford accepted Jones' apology and forgave him.
Ashford also testified that on one occasion, fireworks were set off in the bathroom area of his office. However, Ashford was not in the office at the time. Jones subsequently admitted that he had set off the firecrackers and apologized.
Jones admits that both incidents occurred, but states that the fireworks involved were of a kind meant for indoor use and designed to make confetti. Jones also testified that the note was given to Ashford as part of a series of pranks between the two and that Jones apologized when he discovered that the note had been taken seriously.
The special master found by clear and convincing evidence that the incidents occurred and concluded that the conduct violated Canons 1, 1A, 2, 2A, and 3B(4) of the Code of Judicial Conduct and was conduct prohibited by § 24-722(6).
Jones admits that these incidents occurred, but states that they were meant as pranks. However, the determination of whether conduct is prejudicial to the administration of justice depends not so much on the judge's motives, but more on the conduct itself, the results thereof, and the impact such conduct might reasonably have upon knowledgeable observers. In re Complaint Against Kneifl, 217 Neb. 472, 351 N.W.2d 693 (1984). It is immaterial that a judge's conduct is lawful, albeit unjudicial, or that the judge perceived offensive and harassing conduct as low-humored horseplay. See Geiler v. Commission on Judicial Qualifications, 10 Cal.3d 270, 515 P.2d 1, 110 Cal. Rptr. 201 (1973). Thus, that Jones intended his actions to be seen as pranks does not mitigate the seriousness of his actions. Jones' actions were juvenile, immature, and clearly prejudicial to the administration of justice. Regardless of the motive, such behavior cannot be condoned. Accordingly, we agree with the findings and conclusions of the special master and the commission that the conduct violated Canons 1, 1A, 2, 2A, and 3B(4) of the Code of Judicial Conduct and was conduct prejudicial to the administration of justice, as prohibited by § 24-722(6).

3. COUNT 3: INTEMPERATE REMARKS
Count 3 alleges the following:
On or about July 22, 1993, Jones directed a court employee to deliver a message to Prochaska to get her "fat, fucking ass" to the clerk's office to sign some papers.
... On or about November 30, 1993, Jones, in the presence of another court employee, made a false statement to Prochaska that she had offered Jones oral sex in exchange for his vote for presiding judge; on several occasions thereafter, Jones made false statements to this same court employee to the effect that Prochaska had offered him oral sex.

*885 ... On numerous occasions from 1993 to the present time, Jones has referred to Prochaska, in the presence of other court employees, as a "bitch," "cunt," or "fucking cunt."
... On or about June 25, 1997, Jones, in the presence of and within the hearing of court employees, used profanity, including the phrases "what the fuck am I supposed to do," "find yourself another fucking judge," and "fucking bitch."
... On numerous occasions from 1993 to the present time, Jones has made statements to another judge, to another court employee, and to an Omaha police officer suggesting Jones would like to see Prochaska killed or tortured, including:
 references to stuffing dynamite in her tailpipe, and being there to "watch the mist blow 20 feet in the air";
 turning Prochaska's head into "pink mist";
 and pouring honey on her and letting ants crawl over her.

(a) July 22, 1993, Incident
Robert Wheeler, a court employee, testified that during 1993, he answered Prochaska's telephone, and when asked if he wanted to leave a message for Prochaska, Jones stated, "tell her to get her fat fucking ass over here and sign these papers." Wheeler did not know how to tell another judge that information and relayed the message to his supervisor, Theresa Sims. Sims subsequently told Prochaska the message. Prochaska testified that in addition to the message relayed to her through Sims, Jones also called her and said in a loud angry voice to "[g]et your fucking ass over to the clerk's office right now and do your work that's been sitting there for two days, or a complaint will be filed against you with the Judicial Qualifications Commission by 4:30 this afternoon." According to Prochaska, two people who were not court personnel and a court employee were present and heard a portion of Jones' statement over the speaker phone. Sheril Doll, the court employee present at the time of the call, testified that there were two other people in the office at the time and that she heard Jones tell Prochaska to get her "fucking ass" over to the other side to sign some papers.
The record indicates that Jones does not remember the exact words of the message taken by Wheeler or what he told Prochaska on the phone. However, Jones also testified that he left the phone message hoping it "would light a burr under her saddle" and admitted that he wanted to get Prochaska moving by embarrassing her. Jones further testified that when he called Prochaska, he might have said "cute ass" instead of "fucking ass," but that he did not know for sure which term he used.
Jones testified that he made the comments out of frustration because a stack of unsigned papers had accumulated and it was Prochaska's duty to sign them. However, Prochaska testified that there were no papers to sign that were her responsibility and that there were two stacks of papers that were Jones' responsibility. Jones admitted that regardless of which term he used, or why he used the language he did, he was wrong in doing so.

(b) November 30, 1993, Incident
Prochaska testified that on November 30, 1993, she received a call from Jones requesting to speak with her. Prochaska refused to go to Jones' office, but agreed to talk with him on the telephone, at which point Jones turned on his speaker phone so that Mark Wagner, the court administrator, could listen to the call. Jones indicated that he was angry with Prochaska over times when she had been absent from the court in order to serve on various task forces and committees. Jones then told Prochaska that he wanted her to forfeit her vacation because she had been to too many meetings.
Prochaska testified that Jones then stated, "Come on, Jane ... why don't you just come to your senses and give up your vacation and we can forget this conversation ever happened." Prochaska replied, "Yeah, Deacon [Jones], kind of like you'd like to forget that conversation ever happened last July when you ordered me ... to get my, quote, fucking ass to the clerk's office to do your work." At this point, Prochaska testified that Jones stated, "Jane, what you'd really like to forget *886 is the day that you offered me a blow job in return for my vote for you as presiding judge." Jones admits to making this statement in front of Wagner.
Wagner testified that Jones stated to him several times that Prochaska had offered him oral sex in exchange for his vote. Ashford testified that Jones also made this statement to him.
Prochaska testified that she never made such an offer or statement to Jones either jokingly or seriously. However, Jones testified that she did make such an offer. Regardless, Jones admits that he was wrong in using profanity and vulgar language.

(c) Name-Calling Incidents
Wagner testified that over the past 6 or 7 years, he heard Jones call Prochaska names and believes that Jones used the terms "fucking cunt" and "bitch." Ashford testified that in approximately 1994, Jones called Prochaska a "fucking cunt" because he was concerned she was not doing her job. Court employees Deb Schwarten and Kathleen Favor testified that Jones referred to Prochaska using various derogatory terms at times when lawyers and others were present. Jones admits referring to Prochaska by a number of profane and vulgar names.

(d) June 25, 1997, Incident
The record reflects that at approximately 10:15 a.m. on June 25, 1997, Jones asked Favor, the bailiff, to unlock the door to Prochaska's chambers so that he could have access to the bathroom. Prochaska was on medical leave at the time, but had given orders that Jones could not use her facilities even if she was not using them. Favor did not have a key, so she initially asked Dawn Bottorff, an administrative secretary, to unlock the door. However, Bottorff refused because of Prochaska's orders. Favor then arranged to have the court magistrate open the door. At some point during the morning, Jones used the facilities, and he testified that he was careful to leave the restroom in good condition.
Later in the day, Jones asked that the room be unlocked again, and Favor refused, stating that Bottorff would not let her unlock it because a mess had been made on the floor. Jones then located Bottorff to inquire as to why he could not use the facilities. No allegation is made in the complaint that Jones either intentionally or unintentionally urinated on the floor. Rather, the issue is the language Jones used.
Favor testified that Jones became angry and asked, "`What the hell am I supposed to do?'" and that, referring to Bottorff, Jones asked, "`Who the fuck does she think she is? Who the fuck does she think she works for, if it's not us?'" Favor testified that there were people present when these comments were made and that Jones used a loud enough voice that they could hear him. Bottorff provided similar testimony.
Favor further testified that after checking into whether Jones could use another judge's facilities and finding that those facilities were in use, Jones took his robe off and stated "`[f]uck it, find yourself another judge,'" and left. Another judge filled in for a period of time, but Jones at some point returned and finished the afternoon's business. At the close of business, apparently referring to Bottorff, Jones told Favor that "he was going to get the fucking cunt fired." Favor further testified that sometime after the incident occurred, Jones also stated that if he had a key, he would "shit on [Prochaska's] desk." Wagner testified that Jones spoke with him and referred to Bottorff as a "fucking bitch." Another court employee also overheard Jones angrily say "fucking bitch" before stating that he wanted somebody fired.
Jones' medical doctor testified that due to several medical conditions and treatment for those conditions, Jones experiences a frequent and urgent need to urinate. Jones testified that when he located Bottorff, she seemed to be deliberately attempting to humiliate him. Jones also testified that he left the court area in order to go to his office and get his own keys and only told Bottorff that she would have to find someone else. Jones further testified that he did not call Bottorff anything other than a "snot nosed secretary" during a private meeting with Ashford regarding the incident. The day following the incident, Jones met with Bottorff and apologized.

*887 (e) Threatening Remarks
Jones admits to making a statement to Wagner that he would like to turn Prochaska's head into "pink mist." However, Jones states that he was "venting" when he made this comment and that the "pink mist" comment is somewhat humorous to him. Jones also admits to telling a court employee that if it were not for his wife and children, he would blow Prochaska away. Wagner testified that over the past 6 or 7 years, Jones made threatening statements about Prochaska almost every time he and Jones spoke together. For example, Jones spoke of putting dynamite in the tailpipe of Prochaska's car and of burying Prochaska in the sand up to her head, pouring honey over her head, and putting ants on her head. Jones offered exhibit 64, a deposition indicating that other judges at the county court played jokes during judges' meetings and indicating that Prochaska had also made some intemperate remarks. The special master did not receive exhibit 64.
The special master concluded that the conduct described in count 3 violated Canons 1, 1A, 2, 2A, 3B(4), and 3C(1) and (2) of the Code of Judicial Conduct and was in violation of § 24-722(6). The commission adopted the special master's findings.
Jones admits to making many of the intemperate remarks in count 3, and in his brief, he states that he accepts the findings of the commission and the special master. However, Jones contends that exhibit 64 should have been allowed into evidence, and he requests that we consider this exhibit in our de novo review. However, Jones made a preargument motion to this court offering exhibit 64 into evidence, which we denied.
The numerous incidents of intemperate remarks and threatening behavior in count 3 are clearly inconsistent with the high standards expected of those in judicial office. As stated previously in our discussion of count 2, it is immaterial what motivated Jones to make such remarks. Rather, we are concerned with the results of the conduct. See In re Complaint Against Kneifl, 217 Neb. 472, 351 N.W.2d 693 (1984). Of particular concern is that the outbursts of temper and the use of loud, abusive, vulgar, and threatening language in the presence of a fellow judge and court employees has been an ongoing problem over a period of years and clearly constitutes an abuse of judicial power. It is abundantly clear that such behavior is disruptive to the functioning of the court and harms the integrity of the judicial system as a whole. Accordingly, we adopt the findings and conclusions of the special master and the commission concluding that the conduct violates Canons 1, 1A, 2, 2A, 3B(4), and 3C(1) and (2) of the Code of Judicial Conduct and was conduct prejudicial to the administration of justice, in violation of § 24-722(6).

4. COUNT 4: BONDS AND COURT DOCUMENTS
Count 4 of the complaint states:
On various occasions from 1995 to 1997, Jones signed official court documents with names other than his own, including "Adolf Hitler," "Judge Smallheiser," and "Judge Ryan."
... On various occasions during 1996, Jones entered or set bond amounts for criminal defendants which were nonsensical, or problematic for the court employees who must administer those bonds, including a bond for a "zillion" dollars and one for thirteen cents.
Several court employees testified that they saw fictitious names signed by Jones on plea forms, court registers, and bench warrants. Shirley Kort, the division manager, testified that she saw the names of a city prosecutor, David Smallheiser; a deceased judge, Judge William Ryan; and Adolf Hitler on register of action forms that were signed in Jones' handwriting. Kort further testified that the use of fictitious names created additional work for court employees because they would have to get the information corrected and that if the fictitious signature was on a bench warrant, the office would be unable to issue the warrant until the problem was fixed. Marilyn Donnelly, supervisor of the warrants and accounting department at the court, testified that she saw 12 bench warrants that Jones had signed "Adolph Hitler."
Jones admits to signing plea forms with the names "William Ryan," "Judge Creeder," "Adolf Hitler," "Snow White," and "Mickey Mouse." However, Jones states that he did *888 so in order to keep court employees "on their toes" and states that the false signatures on plea forms did not affect the course of justice. He denies the intentional use of fictitious names on court registers or bench warrants. The record indicates that a court register in Jones' handwriting has Smallheiser, a county prosecutor, listed as both the prosecutor and the judge. Jones testified that this must have been due to a clerical error on his part and that it was not done intentionally.
Kort testified that Jones executed bond documents for 13 cents and $999.99. The record indicates that these odd amounts created problems because the employees were not equipped to make change or enter uneven amounts into the computers and that the odd amounts caused employees to question if the amount was right. Jones admitted to setting bonds at odd amounts and testified that he did it to amuse the court employees or "just to tease them a little bit." Jones further testified that when a bond amount is under $250, the bond is automatically $25. Jones also admitted to possibly setting a bond in a false currency for "a zillion pengos." Jones testified that the effect of this was the same as not setting any bond at all.
The special master found by clear and convincing evidence that the allegations occurred and that the conduct violated Canons 1, 1A, 2, 2A, 3B(3) and (4), and 3C(1) of the Code of Judicial Conduct and § 24-722(6). The commission adopted the findings of the special master.
Jones admits that he signed false names on plea forms and states in his brief that he accepts the findings and conclusions of the special master and the commission regarding both the signatures on plea forms and the bond amounts. However, Jones denies that he placed false signatures on other forms and contends that testimony regarding bench warrants and registers was inadmissable because it was used to prove the contents of documents not in evidence, in violation of Neb.Rev.Stat. § 27-1002 (Reissue 1995). Other than the court register with the name "Smallheiser" listed as both judge and prosecutor, there are no other documents in evidence showing a fictitious signature. The record indicates that such documents would probably have been destroyed because they would have had to be redrafted with the correct signature. Court employees also conducted an extensive search for documents containing fictitious signatures.
Section 27-1002, commonly referred to as the "best evidence" rule or "original document" rule, provides that in order to prove the content of a writing, the original writing is required. However, pursuant to Neb.Rev.Stat. § 27-1004(1) (Reissue 1995), the original is not required, and other evidence of the contents of a writing is admissible, if all originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith.
We have held that the loss or destruction need not be proved beyond the possibility of mistake, as the court is vested with a judicial discretion in the matter, and that it is enough if the testimony satisfies the court of the fact with reasonable certainty. State ex rel. Mercurio v. Board of Regents, 213 Neb. 251, 329 N.W.2d 87 (1983).
In the instant case, there was extensive testimony regarding a search that was conducted for the documents at issue and testimony indicating that the documents were probably destroyed. No allegations have been made that the documents were destroyed in bad faith. Accordingly, testimony regarding the documents was not prohibited by § 27-1002.
Like the conduct discussed in counts 2 and 3, Jones' actions in setting odd bond amounts as an attempt at humor misses the mark and is inappropriate in the judicial system. Jones attempts to mitigate the seriousness of his conduct by stating that the use of false signatures on plea forms did not affect the course of justice. However, the record is clear that the use of false signatures and the setting of irregular bond amounts interfered with the operation of the court and created additional work for court employees. Further, the use of false signatures on bench warrants caused situations where a warrant could not be issued until a new warrant with the appropriate signature was obtained. Such conduct clearly interferes with the *889 court's functioning and is obviously conduct prejudicial to the administration of justice. Accordingly, we adopt the findings and conclusions of the special master and the commission that the conduct violates Canons 1, 1A, 2, 2A, 3B(3) and (4), and 3C(1) of the Code of Judicial Conduct and is conduct prejudicial to the administration of justice, as prohibited by § 24-722(6).

5. COUNT 5: PROBATIONER CONTACT
Count 5 alleges that "[o]n various occasions between 1991 and 1996, Jones engaged in improper ex parte conduct with criminal defendants who appeared before him for sentencing and whom he had placed on probation."
Deborah Minardi, the chief probation officer for the Douglas County District Court, testified that she received complaints from probation officers who were concerned about Jones' having contact with people on probation without the officers' knowledge. As a result, it was difficult for the officers to supervise their clients.
In one instance, Jones placed a man on probation and ordered treatment at a center called Renaissance Place. However, the treatment center reported directly to Jones rather than the probation officer, and at one point Jones had information regarding problems with the client but failed to convey the information to the probation officer.
Mary Dunlay, a former probation officer, testified that Jones referred a client to Valley Hope treatment center without informing the probation officer. After the client was discharged from Valley Hope, he did not report to the probation officer as ordered, and reported directly to Jones.
The record also shows that Jones, at times, ate meals at the homes of individuals whom he had placed on probation and that Jones met and discussed with a criminal defendant the defendant's alcohol problems and treatment options before the defendant entered a plea.
The record shows that on August 14, 1991, Jones assisted in collecting a urine sample from a man who had been placed on probation. Jones testified that he did nothing more than watch or guard the door and that he never handled the sample. However, testimony from Sandy Draper, a probation officer, indicated that Jones entered the restroom with the man, ran water, and talked loudly to the man before returning with a container and announcing that the man could not "pee."
Jones admitted that he sometimes took a personal interest in defendants that he placed on probation, and the record indicates that Jones acted out of a genuine concern for people with alcohol addiction. Jones also admitted that he would sometimes sentence a person to 90 days' jail time, and then visit the person 10 days later and resentence the person to probation. Jones testified that he had stopped doing this.
Jones admits that he has privately met with people whom he had sentenced to probation. However, Jones also states that the testimony showed there were no standards or rules regarding contact between judges and people sentenced to probation.
The special master found by clear and convincing evidence that the allegations occurred and that the conduct violated Canons 1, 1A, 2, 2A, 2B, and 3B(7) of the Code of Judicial Conduct and violated § 24-722(6). The commission adopted the findings of the special master.
The record indicates that Jones met privately with at least one person before that person entered a plea and that Jones had other contacts with people whom he had sentenced to probation. Of most concern is the incident in which Jones assisted in obtaining a urine sample. The impropriety of these contacts is obvious. The record also shows that Jones' actions interfered with the employees in the probation system and made it difficult for probation officers to supervise their clients. These contacts potentially placed Jones in the position of becoming a witness instead of a judicial officer. Such conduct is in violation of the Code of Judicial Conduct and is prejudicial to the administration of justice. Accordingly, we adopt the findings and conclusions of the special master and the commission that Jones' conduct with regard to contacts with people whom he had placed on probation violates Canons 1, 1A, 2, *890 2A, and 2B of the Code of Judicial Conduct and is conduct prejudicial to the administration of justice, in violation of § 24-722(6). With regard to repeated meetings with a defendant before a plea was entered, we find that this conduct further violates Canon 3B(7) of the Code of Judicial Conduct and is also conduct prejudicial to the administration of justice, as prohibited by § 24-722(6).

6. COUNT 6: IMPROPER CONTACT
Neither the special master nor the commission found clear and convincing evidence to support count 6 of the complaint. Accordingly, count 6 is not before this court.

7. COUNT 7: IMPEDING INVESTIGATION
Count 7 alleges the following:
Between 1996 and 1997, during an ongoing investigation by the Judicial Qualifications Commission into certain allegations concerning Jones, Jones gave a false statement to the Commission's investigator about his knowledge of certain information.
... Between 1996 and 1997, during [the same investigation], Jones stated or suggested to other court employees that if he got into any trouble, he would "take" other judges with him, or ruin careers, or in some fashion retaliate against other judges.
In early 1996, a secretary in Jones' office area, Debra Peck, told Judge Thomas McQuade, the presiding judge at that time, that she could no longer work with Jones. As a result, McQuade asked Jones to switch offices with Judge John McGrath. McGrath used a wheelchair, and the change of offices would have allowed McGrath to have easier access to the courtrooms. When Jones refused to move, McQuade told Jones that he had to move because Peck could no longer work with him. Jones moved, and a letter was sent by McQuade to the other judges and court staff stating that Jones voluntarily moved to accommodate McGrath.
When the investigators for the commission asked Jones if his move had anything to do with Peck, Jones responded that it did not. Jones testified that he had not completely made up his mind about moving to accommodate McGrath when he was told about Peck and that he really did voluntarily move. Jones admits that he made comments to Wagner and Ashford that he would take other judges with him and other similar remarks.
The special master found that although Jones made a false statement to the investigator and made the comments listed in the allegation, neither the false statement nor the comments impeded the investigation. However, the commission determined that the false statement was intended to mislead and interfere with an ongoing investigation. We agree with the special master and conclude that although the false statement and comments did occur, there is not clear and convincing evidence that the conduct interfered with the investigation.

IV. DISCIPLINE
Having concluded that Jones has violated the canons of the Code of Judicial Conduct and § 24-722(6) on numerous occasions, we now address the appropriate discipline to be imposed. The commission recommended that Jones be removed from office. This recommendation is entitled to be given weight. However, it is incumbent upon this court to independently fashion an appropriate penalty. See In re Complaint Against Empson, 252 Neb. 433, 562 N.W.2d 817 (1997).
Jones admits that he behaved in an inappropriate manner and accepts that he should be disciplined. However, Jones contends that the sanction of removal from office is too harsh and is not consistent with prior disciplinary actions before this court. Jones argues that because this court has previously removed judges only when their conduct was determined to be willful misconduct, pursuant to § 24-722(1) or (2), he should not be removed from office when he has been charged only with conduct prejudicial to the administration of justice under § 24-722(6).
The goals of disciplining a judge in response to inappropriate conduct are to preserve the integrity of the judicial system as a whole and to provide reassurance that judicial misconduct will not be tolerated. In re Complaint Against Empson, supra. Sanctions should be imposed where necessary *891 to safeguard the bench from those who are unfit. In re Complaint Against Kelly, 225 Neb. 583, 407 N.W.2d 182 (1987). "`The discipline we impose must be designed to announce publicly our recognition that there has been misconduct; it must be sufficient to deter respondent from again engaging in such conduct; and it must discourage others from engaging in similar conduct in the future.' " Id. at 593, 407 N.W.2d at 188. Thus, we must weigh the nature of the offenses with the purpose of sanctions. Id. This court examines the totality of the evidence to determine the proper discipline. See In re Complaint Against Empson, supra.
In the instant case, the record contains letters and testimony in support of Jones that speak of his good record in handling a variety of judicial matters. Notwithstanding, we cannot ignore that Jones violated both the Code of Judicial Conduct and § 24-722 on numerous occasions over a significant period of time. Of particular concern is Jones' consistent use of intemperate and threatening language over a long period of time. In addition, the sending of a death threat to another judge and the igniting of firecrackers in that judge's office in what Jones referred to as "mutual pranks" indicate poor judgment and a level of immaturity that does not have a place within the judiciary. Likewise, Jones' use of false signatures and his placing odd bond amounts reflect poorly on the judicial office. Particularly, the use of a deceased person's name and the name of Adolf Hitler is highly offensive and totally inappropriate in any judicial proceeding. Finally, Jones' consistent practice of close contacts with people placed on probation lends an appearance of impropriety to the bench and shows a tendency for poor judgment. When the violations are considered as a whole, they show a pattern of repeated conduct that reflects in Jones a lack of judicial temperament and a ready willingness to abuse the authority of his office.
Jones cites previous cases in this court in which a sanction of less than removal from office was imposed when the judge in question was found only to have engaged in conduct prejudicial to the administration of justice. However, § 24-722 clearly provides that a judge may be removed from office for conduct prejudicial to the administration of justice. Thus, the cases cited by Jones are not dispositive and in no way limit this court to applying removal as a sanction only in cases that involve willful misconduct. It is the accumulation of offenses committed over a substantial period of time that is of most concern in the instant case.
"`Conduct unbecoming a member of the judiciary may be proved by evidence of specific major incidents which indicate such conduct, or it may also be proved by evidence of an accumulation of small and ostensibly innocuous incidents which, [taken] together, emerge as a pattern of hostile conduct unbecoming a member of the judiciary.'"
In re Complaint Against Empson, 252 Neb. 433, 457, 562 N.W.2d 817, 833 (1997). Accord In re McAllister, 646 So.2d 173 (Fla.1994). Thus, it has been determined that a combination of incidents prejudicial to the administration of justice warranted removal from office as an appropriate sanction. See In re McAllister, supra.
Jones states that he is sorry for his actions and that he will not engage in such conduct again, making the sanction of removal unnecessary for protection of the judicial system. However, the record shows a pattern of apologies by Jones following his outrageous behavior, yet Jones' undignified and abusive behavior persisted. It has been wisely noted that a judicial office is a position of trust, and not a fiefdom. See In re McAllister, supra. Jones failed to grasp or ignored this distinction.
We must weigh the nature of the offenses with the purpose of sanctions when determining the proper disciplinary action in these cases. In re Complaint Against Kelly, 225 Neb. 583, 407 N.W.2d 182 (1987). Jones' continuing pattern of misconduct demonstrates a lack of proper judicial temperament and a fundamental abuse of power that seriously undermines public confidence in the judiciary. These flaws are inconsistent with service as a judge. Removal from office is necessary to preserve the integrity of the judicial system. Because we conclude that removal is appropriate based on the counts *892 discussed in this opinion, we determine that it is not necessary to discuss count 8 of the complaint.
JUDGMENT OF REMOVAL.
WHITE, C.J., and CAPORALE, J., not participating.