784 N.W.2d 897 (2010)
280 Neb. 192
In re Complaint Against Kent E. FLOROM, County Court Judge of the 11th Judicial District of the State of Nebraska.
State of Nebraska ex rel. Commission on Judicial Qualifications, relator,
v.
Kent E. Florom, respondent.
No. S-35-090001.
Supreme Court of Nebraska.
July 9, 2010.
*899 Anne E. Winner, of Keating, O'Gara, Nedved & Peter, P.C., L.L.O., Lincoln, for relator.
Susan L. Kirchmann for respondent.
WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ., and IRWIN, Judge.
PER CURIAM.
This is a judicial discipline case brought by the relator, the Nebraska Commission on Judicial Qualifications (Commission), against the respondent, Kent E. Florom, *900 who has been a county judge in the 11th Judicial District of Nebraska since August 23, 1991. The facts of this case are largely undisputed, and the respondent admits his conduct was improper. Therefore, the primary issue presented in this proceeding is the discipline to be imposed. Because the respondent's course of conduct was clearly, repeatedly contrary to the rules of judicial conduct, and because suspension from office would be insufficient to correct the damage wrought by the respondent's behavior, we remove the respondent from his office as a judge.

BACKGROUND

KRAMER CASE
On February 9, 2008, Sharon Kramer, a North Platte school teacher and softball coach, asked the respondent to be an assistant coach for the youth softball team on which the respondent's daughter played. He accepted.
A few weeks later, the respondent heard a rumor that Kramer was about to be arrested. The respondent approached the county attorney, Rebecca Harling, to discuss the case. Harling explained that the charge involved theft from the North Platte High School booster club. The respondent, assuming that it was some sort of misdemeanor theft, asked Harling whether, if Kramer paid restitution, that would satisfy the victim. Conflicting evidence suggests that the respondent may also have offered to persuade Kramer to pay restitution. Harling replied that Kramer's recordkeeping was so poor that the amount of restitution was unknown.
The respondent later explained that he had spoken to Harling because he wanted to find out about the allegations against Kramer and to find out whether his daughter was in any jeopardy. The respondent also claimed he had been aware of the amount of money that was involved in the softball team and had hoped it was not connected to the alleged crime. The respondent said he had not wanted his daughter's team to be hurt by association with Kramer's arrest. Harling, however, said that none of those concerns had been expressed to her at the time she and the respondent spoke.
On another occasion, Kramer's attorney, Russ Jones, and a different prosecutor were in the respondent's office on other business. They were discussing Kramer's case between themselves. The respondent interjected and asked whether jail time was being sought for Kramer. The respondent also asked the attorneys whether the case would be dismissed if restitution was paid, and said he would pay the restitution. The respondent told Jones to tell Harling that the respondent would put her on "`double secret probation.'" Jones believed the respondent was joking, but conveyed the message. The respondent later admitted there had been "no good reason" for him to have interrupted the attorneys' conversation, but also said he had just been joking.
Kramer was eventually charged with misdemeanor theft, pursuant to a plea agreement. The respondent recused himself from any official participation in the case. The matter was set for a plea and sentencing on June 20, 2008. That day, Jones told the respondent that the charges had become public and that there was media interest. The respondent suggested to Jones that Kramer could plead early, or plead by waiver, in order to avoid an appearance in open court. Harling rejected those options.
Later, a few weeks after Kramer had been sentenced, the respondent asked Harling about subpoenas that had been issued to the school booster club from which Kramer had stolen. The respondent suggested he had heard about the subpoenas from law enforcement. Harling *901 realized that the respondent was probably referring to subpoenas issued in connection with the revocation of Kramer's teaching license by the State Department of Education and that the respondent had apparently discussed the case with a police department investigator.
On July 7, 2008, the respondent had a telephone conversation with Jim Paloucek, who was a member of the North Platte school board and a lawyer practicing in Lincoln County, located within the 11th Judicial District. The respondent had heard a rumor that Paloucek and another member of the board were planning to take some sort of official action against Kramer as a result of her conviction. The respondent asked Jones, a close friend of Paloucek, to pass a message to Paloucek that if Paloucek took action against Kramer, Paloucek would be "`making an enemy'" he did not want to make. The respondent later admitted that he was the "enemy" Paloucek would be making and that he had not been joking. The respondent explained that he had been angry.
After hearing about the respondent's threat, Paloucek and his law partners placed a telephone call to the respondent and asked him to confirm that he made the threat. The respondent confirmed his threat, despite having been counseled by another judge that his actions could be construed as trying to influence a public official. Paloucek described the respondent as "cool," calm, and "matter of fact." The respondent said Paloucek would be making a mistake by taking action against Kramer. Paloucek and one of his partners also reported that the respondent told Paloucek that "favors extended in the past would not be extended in the future," although the respondent did not remember making that remark. Paloucek expressed a concern that the respondent was using his judicial office to try to influence Paloucek's actions as an elected official. The respondent replied that Paloucek should ask for recusal when appearing in front of him. Paloucek and his law partners have done so since.
On July 15, 2008, the respondent wrote and signed a letter, on his judicial letterhead, that was intended to help Kramer keep her job with the North Platte school district. The letter stated, in relevant part:
I have always felt that Sharon Kramer was a person of integrity. No one was more surprised than I at her breach of public trust. As a judge, I see thousands of cases each year where people have violated the law. Never have I seen anyone step forward with the remorse and self-responsibility that I witnessed from Sharon Kramer.
The letter also commended Kramer's contrition and acceptance of responsibility, and recommended that Kramer remain employed by the school district.
The respondent later explained that the July 15, 2008, letter had mistakenly been on judicial letterhead because his word processor defaulted to his judicial stationery. The respondent said that the July 15 letter had been intended to be confidential to Kramer, her attorney, and her union representative. But on November 13, the respondent wrote another letter on behalf of Kramer, this time to the Nebraska Professional Practices Commission, regarding Kramer's license to teach. That letter was on a personal letterhead, but was substantially the same, including the references to the respondent's judicial office.

JUVENILE CASE
In October 2007, L.W., a juvenile, came under the jurisdiction of the Lincoln County Court sitting as a juvenile court, and the respondent placed her on probation. L.W. was prosecuted by Harling, and L.W.'s assigned caseworker was Megan Luebbe, of the Nebraska Department of Health *902 and Human Services. L.W. was also a player on the softball team that the respondent later agreed to coach. In March 2008, after the respondent agreed to coach L.W.'s softball team, Harling filed a motion to revoke L.W.'s probation. The respondent recused himself from the case. Nonetheless, after Luebbe appeared in the respondent's court on another matter, the respondent called Luebbe into his chambers and told her he was speaking to her "as a softball coach and not as a judge." The respondent explained his interest in L.W.'s case, talked about her talent as a player, and asked about her placement recommendations.
Later, in order to facilitate L.W.'s participation with the team, the respondent and his wife served as her chaperones, which generally meant that after L.W.'s father dropped her off at tournaments, the respondent and his wife watched her. The respondent had chaperoned other players in the past, although none had been involved in the juvenile court system. Ultimately, L.W. was allowed to participate in softball tournaments she would not have been able to attend had the respondent not agreed to chaperone her.
And while L.W.'s juvenile case was pending, the respondent spoke to Harling several times about the case. On one occasion, the respondent asked Harling to "`take care of [his] short-stop,'" although the respondent later said he had just been teasing Harling. On other occasions, the respondent asked Harling about L.W.'s whereabouts and whether she would be permitted to play softball and travel with the team. The respondent also had several contacts with Luebbe regarding L.W.'s disposition. And despite the fact that the county judge handling the case advised the respondent that he would not discuss the case with the respondent, the respondent asked the assigned judge one morning, over coffee, whether L.W.'s case had proceeded to disposition.

DISCIPLINARY PROCEEDINGS
The respondent's conduct was reported to the Commission, which initiated an investigation. The Commission filed a complaint charging the respondent with violating Canons 1, 2, 3, and 4 of the Nebraska Code of Judicial Conduct (Code).[1] This court appointed a master to conduct a hearing.[2] The Commission found clear and convincing evidence that the respondent had violated Canons 1, 2, 3, and 4, and additionally found clear and convincing evidence that the respondent's conduct was prejudicial to the administration of justice and had brought the judicial office into disrepute. The Commission recommended that the respondent be removed from his judicial office. The respondent filed a petition in this court objecting to certain conclusions reached by the Commission and to the Commission's disciplinary recommendation.

ASSIGNMENTS OF ERROR
The respondent argues that removal from the bench is arbitrary and unwarranted under the circumstances and that a sanction short of removal is appropriate.

STANDARD OF REVIEW
In a review of the findings and recommendations of the Commission, this court shall review the record de novo and file a written opinion and judgment directing action as it deems just and proper, and may reject or modify, in whole or in part, the recommendation of the Commission.[3] Upon our independent inquiry, we must *903 determine whether the charges against the respondent are supported by clear and convincing evidence and which, if any, canons of the Code and subsections of Neb. Rev.Stat. § 24-722 (Reissue 2008) have been violated.[4] If violations are found, we must then determine what discipline, if any, is appropriate under the circumstances.[5]

ANALYSIS

CODE OF JUDICIAL CONDUCT PROVISIONS
Section 24-722(6) provides that a judge of any court of this state may be reprimanded, disciplined, censured, suspended without pay for a definite period of time not to exceed 6 months, or removed from office for conduct prejudicial to the administration of justice that brings the judicial office into disrepute. Conduct that clearly violates the Code constitutes, at a minimum, a violation of this section.[6]
As relevant, the Code provides that "[a]n independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing high standards of conduct and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved."[7] The Code also provides that "[a] judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."[8] To that end, the Code states:
A judge shall not allow family, social, political, or other relationships to influence the judge's judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge. A judge shall not testify voluntarily as a character witness.[9]
The judicial duties of a judge take precedence over all the judge's other activities.[10] A judge shall hear and decide matters assigned to the judge except those in which disqualification is required.[11] And a judge shall conduct all of the judge's extrajudicial activities so that they do not cast reasonable doubt on the judge's capacity to act impartially as a judge, demean the judicial office, or interfere with the proper performance of judicial duties.[12]
The Commission found that the respondent had violated the foregoing provisions of the Code and § 24-722(6). The respondent does not take issue with that conclusion, and on our de novo review, we agree. We find clear and convincing evidence, as summarized above, that the respondent violated Canons 1, 2, 3, and 4 of the Code and § 24-722(6).

APPROPRIATE DISCIPLINE
The remaining issue is the appropriate discipline to be imposed. While the disciplinary recommendation of the Commission is entitled to be given weight, it is incumbent upon this court to independently fashion an appropriate penalty.[13]
*904 In a judicial discipline proceeding, we weigh the nature of the offenses with the purpose of the sanctions and examine the totality of the evidence to determine the proper discipline.[14] Sanctions should be imposed where necessary to safeguard the bench from those who are unfit.[15] This court disciplines a judge not for purposes of vengeance or retribution, but to instruct the public and all judges of the importance of the function performed by judges in a free society.[16] And it is one of the more important and difficult tasks we undertake. The goals of disciplining a judge in response to inappropriate conduct are to preserve the integrity of the judicial system as a whole and to provide reassurance that judicial misconduct will not be tolerated.[17] The discipline imposed on a judge must be designed to announce publicly this court's recognition that there has been misconduct. And appropriate discipline should discourage others from engaging in similar conduct in the future.[18]
The respondent argues that in cases presenting comparable circumstances, we have imposed sanctions of suspension, not removal from office. For example, most recently, in In re Complaint Against Marcuzzo (Marcuzzo),[19] a county judge's nephew was charged with a misdemeanor and reached a plea agreement that would have imposed a short jail sentence. But the judge's nephew failed to appear in court, so an arrest warrant issued and the plea offer was revoked. Judge Marcuzzo asked the prosecutor to keep the plea offer open and called his nephew's attorney, arranging a meeting between Judge Marcuzzo, his nephew, and the attorney. Judge Marcuzzo told them that he had arranged for a different county judgenot the judge assigned to the case originallyto accept his nephew's plea. That judge took the nephew's plea and sentenced him to probation. That incident, along with two instances of intemperate behavior, resulted in a 120-day suspension.[20]
The respondent also relies upon In re Complaint Against White (White),[21] in which a county judge, who was angered when one of her rulings was reversed on appeal to the district court, tried to secure further review of the ruling. Specifically, Judge White sought to assist the prosecutor in preparing an appeal. And when the prosecutor decided not to appeal, Judge White enlisted a friend on the district court bench to hear a petition to appoint a special prosecutor to appeal instead. This conduct resulted in a 120-day suspension.[22]
And in In re Complaint Against Kneifl (Kneifl),[23] a district court judge who was arrested for driving under the influence cursed at a police officer and threatened other officers with reprisals, saying that they "`better never be' in his court and that if they ever came before him in his court, they would `be sorry.'" In another incident, the judge told a county attorney's partner that an acquaintance of the judge *905 had been charged with driving under the influence and asked the partner or county attorney to see what could be done for the acquaintance. We imposed a 3-month suspension, along with alcohol evaluation and any recommended alcohol treatment.[24]
On the other hand, in In re Complaint Against Kelly,[25] a judge was removed from office for interfering with a pending case. In that case, Judge Kelly's son was cited for a traffic infraction. Judge Kelly advised him to plead guilty and pay the fine. The judge removed the ticket from the court file and told his son to come back when he had the money to pay the ticket. But the fine was not paid for over a year, until after the ticket was found in Judge Kelly's desk drawer by another judge. In addition, both the sentencing judge and probation officer reported ex parte contacts with Judge Kelly concerning his son's compliance with the terms of his probation. Ultimately, we found that Judge Kelly's conduct warranted removal from the bench.[26]
In this case, contrary to the respondent's argument, we find that the respondent's conduct was more egregious than that which resulted in suspensions in Marcuzzo, White, and Kneifl. In Marcuzzo, the judge's interference in his nephew's case was an isolated instance that took place over the course of a few hours. In White, the judge's conduct was more prolonged, but was limited to a single case and lasted only a few days. And in White, while the judge's conduct was certainly improper, it was motivated by professional concern over a decision the judge believed to be incorrectnot a personal bias. By contrast, in this case, the respondent abused his judicial position to interfere in two different cases, over the course of several months, for entirely personal reasons.
And in neither Marcuzzo nor White did a judge threaten a member of the practicing bar with reprisal for acting against the judge's interests. Here, the respondent did precisely that. Not only was it reasonable for Paloucek and his partners to believe that the respondent had threatened to use his judicial power to disadvantage them and their clients, it was in fact the only reasonable interpretation of the respondent's behavior.
In Kneifl, an intoxicated judge tried to intimidate the police officers who were arresting him. But in this case, neither alcoholism nor duress mitigates the respondent's conduct. The respondent not only threatened members of the bar with abuse of judicial power, but repeated his threat, after ample time for reflection, and after having been dissuaded from doing so by the good advice of a fellow judge. There is no excuse for the respondent's conduct, and it is hard to imagine conduct that, coming from a judge, could be more damaging to the reputation of the judiciary.
And while the respondent's threats to Paloucek are certainly the most troubling part of this record, they are far from the only cause for concern. The respondent repeatedly made his personal interest in the outcome of a case known to several lawyers, who appeared before him regularly and would have good cause to worry about displeasing him. The respondent's claim that he was just "joking" is not an excuse.[27] The respondent invoked his judicial office repeatedly in serving as a character reference for a convicted criminal, *906 despite the clear statement in the Code that a "judge shall not lend the prestige of judicial office to advance the private interests of the judge or others,"[28] and the even clearer comment that "judicial letterhead must not be used for conducting a judge's personal business."[29] Although "a judge may, based on the judge's personal knowledge, serve as a reference or provide a letter of recommendation," the respondent's reference to his judicial experience, when viewed in the context of other events, does not reflect the "sensitiv[ity] to possible abuse of the prestige of office" that the Code unequivocally requires.[30]
It is difficult to see how suspension would serve the interests of deterrence when the respondent was cautioned, repeatedly, about the impropriety of his conduct. To begin with, his conduct on several instances was unquestionably contrary to unambiguous provisions of the Code. And he was confronted, at various times, with the implications of his conduct, by Paloucek and other attorneys, and even by a fellow judge. A suspension may be used to impress the severity of misbehavior upon those subject to discipline, but the primary motivation for proper conduct by judges must always be respect for the law, not fear of punishment. In this case, the respondent should have known that his conduct was unethical. However, he ignored the Code. Then he was told that his conduct was unethical, more than once. But he ignored those warnings, and kept doing it anyway. He demonstrated a disregard for ethical rules that a suspension cannot overcome.
We recognize that in a judicial discipline proceeding, the respondent's general performance as a jurist may be a relevant factor to consider in determining the appropriate discipline.[31] The respondent has served on the bench for nearly 19 years, and except for the conduct noted here, there is nothing in the record to suggest that his performance has been unsatisfactory. But the conduct evidenced here is a course of conduct, not an isolated incident.[32] And there are several lawyers in the 11th Judicial District whose confidence in the respondent's fairness as a judge cannot, we believe, be restored. Therefore, we conclude that removal from office is necessary to preserve the integrity of the judicial system.

CONCLUSION
As explained above, the respondent's course of misconduct demonstrates a lack of regard for the Code that seriously undermines public confidence in the judiciary. Therefore, we conclude that removal from office is the only appropriate remedy.
JUDGMENT OF REMOVAL.
HEAVICAN, C.J., not participating.
NOTES
[1] See Neb.Code of Judicial Conduct §§ 5-201 to 5-204.
[2] See Neb. Ct. R. § 5-107.
[3] In re Complaint Against White, 264 Neb. 740, 651 N.W.2d 551 (2002).
[4] Id.
[5] Id.
[6] See In re Complaint Against Marcuzzo, 278 Neb. 331, 770 N.W.2d 591 (2009).
[7] § 5-201.
[8] § 5-202(A).
[9] § 5-202(B).
[10] § 5-203(A).
[11] § 5-203(B)(1).
[12] § 5-204(A).
[13] In re Complaint Against White, supra note 3.
[14] In re Complaint Against Krepela, 262 Neb. 85, 628 N.W.2d 262 (2001).
[15] Id.
[16] In re Complaint Against White, supra note 3.
[17] In re Complaint Against Marcuzzo, supra note 6.
[18] See In re Complaint Against White, supra note 3.
[19] See Marcuzzo, supra note 6.
[20] See id.
[21] See White, supra note 3.
[22] See id.
[23] In re Complaint Against Kneifl, 217 Neb. 472, 476, 351 N.W.2d 693, 696 (1984).
[24] See id.
[25] See In re Complaint Against Kelly, 225 Neb. 583, 407 N.W.2d 182 (1987).
[26] See id.
[27] See In re Complaint Against Jones, 255 Neb. 1, 581 N.W.2d 876 (1998).
[28] § 5-202(B).
[29] Comment, § 5-202(B).
[30] Id.
[31] In re Complaint Against Krepela, supra note 14.
[32] See In re Complaint Against Jones, supra note 27.