IN RE APPLICATION OF JOHN ANDREW MAJOREK FOR ADMISSION TO THE NEBRASKA STATE BAR ON EXAMINATION.
508 N.W.2d 275

Filed November 24, 1993.    No. S-34-930003.

Patrick W. Healey for applicant.

James J. DeMars, of DeMars, Gordon, Olson, Recknor & Shively, for Nebraska State Bar Commission.

HASTINGS, C.J., BOSLAUGH, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ.

PER CURIAM.

The applicant, John Andrew Majorek, born September 28, 1959, challenges the recommendation of the Nebraska State Bar Commission to this court that he not be permitted to take the bar examination because of his failure to establish that he presently possesses the proper character and fitness to practice law. We accept the commission's recommendation and thus rule that the applicant be, and hereby is, denied permission to take the bar examination until such time as this court may determine otherwise on further application filed directly in this court in this proceeding.

Neb. Ct. R. for Adm. of Attys. 2 (rev. 1992) requires an applicant for admission to the bar to show, among other things, that the applicant is of "good moral character." Appendix A to said rules provides, in relevant part:

PURPOSE. The primary purposes of character and fitness screening before admission to the bar of Nebraska are to assure the protection of the public and to safeguard the justice system. The attorney licensing process is incomplete if only testing for minimal competence is undertaken. The public is adequately protected only by a system that evaluates character and fitness as those elements relate to the practice of law. The public interest requires that the public be secure in its expectation that those who are admitted to the bar are worthy of the trust

and confidence clients may reasonably place in their attorneys.

. . . .

STANDARD OF CHARACTER AND FITNESS. An attorney should be one whose record of conduct justifies the trust of clients, adversaries, courts, and others with respect to the professional duties owed to them. A record manifesting a significant deficiency in the honesty, trustworthiness, diligence, or reliability of an applicant may constitute a basis for denial of admission.

RELEVANT CONDUCT. The revelation or discovery of any of the following should be treated as cause for further inquiry before the bar commission decides whether the applicant possesses the character and fitness to practice law:

1. misconduct in employment;

2. acts involving dishonesty, fraud, deceit, or misrepresentation;

3. abuse of legal process, including the filing of vexatious lawsuits;

4. neglect of financial responsibilities;

5. neglect of professional obligations;

6. violation of an order of a court, including child support orders;

7. evidence of mental or emotional instability;

8. evidence of drug or alcohol dependence or abuse;

9. denial of admission to the bar in another jurisdiction on character and fitness grounds;

10. disciplinary action by a lawyer disciplinary agency or other professional disciplinary agency of any jurisdiction.

USE OF INFORMATION. The bar commission will determine whether the present character and fitness of an applicant qualify the applicant for admission. In making this determination through the processes described above, the following factors should be considered in assigning weight and significance to prior conduct:

1. the applicant's age at the time of the conduct;

2. the recency of the conduct;

3. the reliability of the information concerning the conduct;

4. the seriousness of the conduct;

5. the factors underlying the conduct;

6. the cumulative effect of the conduct or information;

7. the evidence of rehabilitation;

8. the applicant's positive social contributions since the conduct;

9. the applicant's candor in the admissions process;

10. the materiality of any omissions or misrepresentations.

In responding to an inquiry on the bar application form as to whether he had been disciplined by a school, college, or university, the applicant revealed that he had been disciplined in 1991 for making personal use of student funds while attending law school. In response to another question, the applicant disclosed that on April 27, 1992, he had been charged with speeding while his operator's license was suspended and with providing false information to an officer.

In investigating the applicant, the commission discovered two matters the applicant had not made known, namely, that he had encountered the criminal justice system in May 1982 for writing a bad check and that on June 25, 1991, he had been charged with taking merchandise without making payment.

The first of the aforedescribed misdeeds occurred on March 20, 1991, apparently during the applicant's second year of law school when, as treasurer of the student chapter of a lawyers' association, he wrote a check to himself in the amount of either $300 or $350 on the chapter's account. Within approximately a week, the applicant repaid the amount he had taken by mailing a deposit of his own funds to the chapter account. At about the same time, without having been confronted by anyone, the applicant notified the chapter president of his actions.

The applicant explained that in December 1990, his father suffered a paralyzing stroke while visiting in Washington, D.C. His father remained hospitalized and underwent speech and physical therapy until sometime in April 1992. At this time, the applicant lived and attended law school in Lincoln, worked as a law clerk for an Omaha law firm, and took responsibility for

managing his parents' household in Omaha until they returned. In addition, he served as president of a student organization and was active in political campaigns.

While all this was occurring, the transmission in the applicant's automobile "went out." Being between paychecks, he tried to contact several friends to borrow the money to repair the vehicle, as he felt that because of his parents' situation he could not borrow from them. After twice unsuccessfully trying to call the chapter president for help, he came to feel that he was between a rock and a hard place, or in a Catch-22 situation, stating: "If I did not repair my car, I could not work, and could not get to classes. If I did not work, I could not earn money to repair my car."

When the applicant was questioned by a commission member, the following exchange occurred:

> [Commissioner]: Do you feel that what you have told us about this situation excuses your action?

> [Applicant]: Oh, no. There is never an excuse for that action. I think there are mitigating factors that perhaps should enlighten on why I acted the way I did. No, I never expect to be excused for the wrongs that I have done.

> [Commissioner]: Your continued use of the word "borrowing" gives me great concern because what you did was not borrow funds. You were embezzling funds.

> [Applicant]: I realize that the act is an act of embezzlement, sir, and I do accept — I think as I said earlier, that I used that word to explain the state of my mind I was at that time. Yes, I took the money, it was wrong and I can never — I never expect to be totally resolved in my whole life for it. I mean it's something I have to live with forever.

As to the second revealed transgression, the applicant explained that his operator's license had been suspended because he had accumulated an excessive number of points and was thus "trying to refrain from driving." He commuted to law school from Omaha with other students, and at times he stayed with a friend in Lincoln. On the day in question, he had forgotten class notes which he needed to study for a final examination in Lincoln, and was driving back to Omaha to get

them when he was stopped for speeding. He panicked and gave his twin brother's name and address to the officer. After 5 to 10 minutes, he concluded he could not do that and identified himself correctly. He pled guilty to giving false information to an officer and to driving without an operator's license on his person.

The applicant claims to have no recollection of the bad check charge discovered by the commission but, having reviewed the court files, is satisfied that he did indeed write the check in question. The court records show that the check had been issued to a department store in the amount of $36.40 and that the charge was subsequently dismissed at the applicant's cost. He further admits that on a couple of occasions, he has written checks that have been returned for insufficient funds, adding that he has made them good.

Finally, the applicant explains that he did not mention the second act of misconduct the commission discovered simply because it had slipped his mind. On the day of his arrest, he had gone to a grocery store to pick up two packs of cigarettes and a newspaper, paying for the goods at a courtesy counter. The clerk apparently charged him for only one pack of cigarettes and the newspaper. The applicant gave no thought to the amount he was charged and did not realize he had not been charged for the second pack. He proceeded into the restaurant portion of the establishment and had breakfast. When he left more than an hour later, he was stopped at the door and accused of taking the second pack of cigarettes.

Although he continues to maintain that he did not intend to take the merchandise without paying, he decided to enter the pretrial diversion program. He successfully completed the program by payment of restitution and costs and by performing 30 hours of community service.

The applicant acknowledges that it was improper for him not to disclose the merchandise event, although he does not believe actual charges were ever filed because of his entrance into the diversion program. However, the relevant application question is very broad, reading:

> Have you, either as an adult or as a juvenile, been arrested, taken into custody, or accused formally or

informally of the violation of any law? Yes _____ No _____.
You must disclose each instance even though charges may not have been formally brought against you or they were dismissed or you were acquitted or adjudication was withheld or a conviction was reversed, set aside or vacated or the record sealed or expunged.

In extenuation, the applicant told the commission:

I'm not asking you to bury your head in the sand or look the other way with the transgressions I had in the past or with my omission because they're all serious and you're justified in raising the questions about them. . . . I would never intentionally hide something from this Commission because . . . I knew that I would come under scrutiny because I know the things that — the two very serious things that were reported were quite serious and you would take a look at them.

As [my employer] testified, I worked very long hours, plus I had, during the preparation time for the bar application, I was also staying on with the Clinic. I was also going through the Bar Review portion that started at the end of May, beginning of June. In sum, I allowed myself to be overloaded and made the mistake of waiting to the last moment and I made a mistake in not requesting a police report on myself. If I would had [sic] done that, everything would have been clear and I would have had the paper in front of me to do it. I made the mistake of waiting to the last moment to do it, and that's not right in anything in life, especially in the practice of law. There are timetables that need to be done, schedules you got to stick with, otherwise you can't adequately represent your clients and I know that and I've taken steps to manage my time, manage my life better.

A Lincoln attorney, who has employed the applicant as a law clerk since May 1991, testified that he was not aware of the four incidents at the time they occurred or prior to hiring the applicant, but became aware of those matters in June or July 1992. The attorney stated that the applicant had certainly changed in the 2-year period he has known him, becoming more contemplative; the attorney had no reservations about the

applicant's candor or trustworthiness and considered him to be fully honest in all respects. The attorney also described the applicant as being quite diligent and competent as compared to numerous others entering the practice of law whom he has known and with whom he has associated.

A second attorney for whom the applicant had also worked had been made aware of the four incidents and, notwithstanding that knowledge, had no question about the applicant's integrity or moral character. This second attorney, too, had noticed a change in the applicant; in her eyes he had matured and felt contrition for his past conduct. She believed the applicant had proven himself able to survive pressures without resorting to inappropriate responses as he had previously.

The applicant testified before the commission that in his mind, the turning point had occurred when he provided false information to the police, realized his mistake, and belatedly corrected it.

After the commission's recommendation, and with the second attorney's encouragement, the applicant sought professional counseling. His counselor submitted an affidavit declaring that she had counseled the applicant 12 times between October 10, 1992, and April 19, 1993. According to the counselor, during the sessions, the applicant looked at the self-destructive and self-defeating behaviors to which he appeared to have succumbed when under stress or feeling low self-esteem or low self-worth. It was the counselor's impression that the applicant may have acted inappropriately at the time of his father's stroke because of the applicant's intense need to succeed and gain his father's approval. In the counselor's view, the applicant has matured since October 1992.

Both a college professor and a professor at the law school the applicant attended recommended that the applicant be admitted, notwithstanding their knowledge of his past indiscretions. Indeed, the dean of the law school, with full knowledge of the misappropriation of funds, certified the applicant as fit to practice under supervision as a law school senior, pursuant to Neb. Ct. Misc. R., Rule of Legal Prac. by Approved Sr. Law Students (rev. 1992). A former U.S.

Representative for whom the applicant had handled campaign funds and other campaign responsibilities and in whose congressional office the applicant later worked highly recommended the applicant, as did a county commissioner on whose campaign the applicant had also worked.

A number of the applicant's other friends and business and political associates filed affidavits with the commission attesting to their perception of the applicant's good character.

The legal reality is, however, that this court, and only this court, is invested with the power to admit persons to the practice of law and to fix qualifications for admission to the bar. Neb. Const. art. II, § 1, and art. V, §§ 1 and 25; *State, ex rel. Ralston, v. Turner*, 141 Neb. 556, 4 N.W.2d 302 (1942); *State, ex rel. Wright, v. Hinckle*, 137 Neb. 735, 291 N.W. 68 (1940). Thus, this court has the responsibility to adopt and implement systems designed to protect the public and safeguard the justice system by assuring that those admitted to the bar are of such character and fitness as to be worthy of the trust and confidence such admission implies. See *State v. Fisher*, 103 Neb. 736, 174 N.W. 320 (1919) (license to practice law granted on implied understanding licensee shall demean self in proper manner and abstain from practices which bring discredit upon licensee, profession, and court).

The applicant was 31 years old when he misappropriated his fellow students' funds and had spent considerable time studying law—the misappropriation was hardly the act of a naive and callow youth. While the applicant found himself in a difficult financial situation, the circumstance provides no excuse for his conduct.

We routinely disbar attorneys who cannot distinguish between their money and that of their clients. *State ex rel. NSBA v. Veith*, 238 Neb. 239, 470 N.W.2d 549 (1991); *State ex rel. NSBA v. Statmore*, 218 Neb. 138, 352 N.W.2d 875 (1984); *State ex rel. Nebraska State Bar Assn. v. Ledwith*, 197 Neb. 572, 250 N.W.2d 230 (1977). We also hold that a lawyer's restitution of funds wrongfully converted after his or her being faced with legal accountability does not exonerate professional misconduct. *State ex rel. NSBA v. Statmore, supra*; *State ex rel. Nebraska State Bar Assn. v. Ledwith, supra*.

A brief year after misappropriating funds and shortly before graduating from law school, the applicant's first impulse, when faced with the fact that he was caught driving at a time when the law says he should not have been, was to take the easy way out and identify himself as someone else.

The fact that the applicant could forget encountering the criminal justice system for writing an insufficient-funds check even as long as 10 years earlier, when he was 22 years old, is, in and of itself, bothersome. Does the lapse of memory indicate that he did not consider the matter serious? Does it indicate that he represses unpleasant experiences and thus does not learn from them? Does the latter hypothesis explain why he has written other insufficient-funds checks? Whatever the explanation, the applicant's self-confessed forgetfulness about so serious a matter does not inspire confidence in his fitness to practice law.

While we can understand that the applicant may well have been unaware that he had not been charged for, and thus had not paid for, the second pack of cigarettes, his explanation that he forgot to disclose the event because he was in a hurry when completing his application for admission to the bar is neither credible nor exculpatory. He either failed in his obligation to accurately complete the application or deliberately tried to conceal the charge against him. Neither is comforting.

In this regard, we agree with the courts which hold that false, misleading, or evasive answers to bar application questions may be grounds for a finding of lack of requisite character and fitness. *In re Beasley*, 243 Ga. 134, 252 S.E.2d 615 (1979). Accord, *Layon v. North Dakota State Bar Bd.*, 458 N.W.2d 501 (N.D. 1990); *In re Johnson*, 259 Ga. 509, 384 S.E.2d 668 (1989); *In re Green*, 464 A.2d 881 (Del. 1983); *In re Fitzpatrick*, 247 Ga. 55, 273 S.E.2d 618 (1981); *In re Ascher*, 81 Ill. 2d 485, 411 N.E.2d 1 (1980), *cert. denied* 450 U.S. 919, 101 S. Ct. 1365, 67 L. Ed. 2d 345 (1981); *Application of Walker*, 112 Ariz. 134, 539 P.2d 891 (1975), *cert. denied* 424 U.S. 956, 96 S. Ct. 1433, 47 L. Ed. 2d 363 (1976); *In re Bowen*, 84 Nev. 681, 447 P.2d 658 (1969).

The applicant's claim that, whatever may be said about his past conduct, he has rehabilitated himself is not persuasive.

While he claims that the turning point came when he immediately corrected the false information he gave to the police, the fact remains that he was less than candid when he later completed his application for admission to the bar.

One of the better statements of the nearly universal position on character and rehabilitation is found in *In re Application of Allan S.*, 282 Md. 683, 690, 387 A.2d 271, 275 (1978):

> Although a prior conviction is not conclusive of a lack of present good moral character, particularly where the offense occurred a number of years previous to the applicant's request for admission, it adds to his burden of establishing present good character by requiring convincing proof of his full and complete rehabilitation. [Citations omitted.] Thus, a prior conviction must be taken into account in the overall measurement of character and considered in connection with other evidence of subsequent rehabilitation and present moral character. [Citations omitted.] It is not without significance in this regard, as bearing upon moral fitness, that an applicant for admission to the bar refuses to admit his criminal conduct. [Citation omitted.]
>
> The ultimate test of present moral character, applicable to original admissions to the Bar, is whether, viewing the applicant's character in the period subsequent to his misconduct, he has so convincingly rehabilitated himself that it is proper that he become a member of a profession which must stand free from all suspicion. [Citations omitted.] That the absence of good moral character in the past is secondary to the existence of good moral character in the present is a cardinal principle in considering applications for original admission to the Bar.

Accord *In re Application of A. T.*, 286 Md. 507, 408 A.2d 1023 (1979).

The practice of law is not a stress-free pursuit, and we are not convinced that the counseling the applicant undertook only after the commission recommended that he not be permitted to take the bar examination will be as successful as his counselor predicts or that he has yet learned not to take on more than he can handle.

The applicant's heavy reliance on *In re Application of Simmons*, 63 Ohio St. 3d 1, 584 N.E.2d 1159 (1992), for the proposition that he should be permitted to take the bar examination at this time is misplaced. It is true that in *In re Application of Simmons*, the court concluded that, a year having elapsed after the applicant first sought to take the bar examination, the applicant, who admitted having misappropriated funds from a student organization while at law school, could then sit for the examination. Not only is *In re Application of Simmons* distinguishable on the facts, as the miscreant therein had been guilty of no other misconduct, but also we simply consider the inability to distinguish between what is one's own and what is another's a serious character flaw not easily overcome.

As noted in *In re Cason*, 249 Ga. 806, 808-09, 294 S.E.2d 520, 522-23 (1982):

> Payment of the fine or service of the sentence imposed, and not committing further crimes, standing alone, do not prove rehabilitation. Merely showing that an individual is now living as and doing those things he or she should have done throughout life, although necessary to prove rehabilitation, does not prove that the individual has undertaken a useful and constructive place in society. Positive action showing rehabilitation may be evidenced by such things as a person's occupation, religion, or community service.

The fact is that in reviewing an application for admission to the bar, the decision as to an applicant's good moral character must be made on an ad hoc basis. *Application of Greenberg*, 126 Ariz. 290, 614 P.2d 832 (1980). In a disciplinary proceeding against a district court judge, we observed:

> In the final analysis . . . any effort to design the appropriate discipline in this matter by comparing it with that imposed in any case by any other jurisdiction is of limited value. Although analyzing what other jurisdictions have done is instructive, the responsibility of defining and enforcing proper conduct for Nebraska judges falls upon this tribunal.

*In re Complaint Against Kneifl*, 217 Neb. 472, 485, 351 N.W.2d

693, 700 (1984).

In like manner, it falls to this court to determine that the applicant has failed to show he presently possesses the proper character and fitness to be admitted to the bar of Nebraska and must thus be denied the opportunity to take the bar examination until such time as this court may determine otherwise on further application filed directly in this court in this proceeding.

RECOMMENDATION SUSTAINED.

WHITE and SHANAHAN, JJ., not participating.