IN RE APPLICATION OF PAUL RAYMOND CONVERSE FOR ADMISSION TO THE NEBRASKA STATE BAR ON EXAMINATION.
PAUL RAYMOND CONVERSE, APPELLANT, V. NEBRASKA STATE BAR COMMISSION, APPELLEE.
602 N.W. 2d 500

Filed November 19, 1999. No. S-34-990001.

Jay E. Denne, of Munger & Reinschmidt, for appellant.

Michael G. Lessmann and Denzel R. Busick for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

PER CURIAM.

Paul Raymond Converse appeals a decision of the Nebraska State Bar Commission (Commission) denying his request to take the July 1998 Nebraska bar examination. Converse claims that the decision of the Commission should be reversed because the Commission rested its denial of Converse's application, at least in part, upon conduct protected by the First Amendment to the U.S. Constitution and, in the alternative, that Converse's conduct did not constitute sufficient cause under Nebraska law for denying his application on the ground of deficient moral character. For the reasons that follow, we affirm the decision of the Commission.

## FACTUAL BACKGROUND

In 1998, Converse applied for permission to sit for the Nebraska bar examination. On June 29, 1998, Converse was notified by letter that the Commission had denied permission for him to take the July 1998 Nebraska bar examination because it had determined that Converse lacked the requisite moral char-

acter for admission upon examination to the Nebraska State Bar Association. On July 7, the Commission received notice that Converse was appealing the Commission's initial determination. Converse's appeal was heard on September 15, after which the Commission reaffirmed its initial determination and notified Converse on December 18 that he would not be allowed to sit for the Nebraska bar examination at that time.

The evidence at the Commission hearing revealed that as part of the application process, Converse was required to request that the dean of his law school submit a form certifying completion of Converse's law school studies. That form contained a question asking, "Is there anything concerning this applicant about which the Bar Examiners should further inquire regarding the applicant's moral character of fitness to practice law?" The question was answered, "Yes," and the dean also noted, "Additional information will be provided upon request." The Commission followed up on this notation by conducting an investigation which ultimately revealed certain facts regarding Converse.

After the completion of his first semester at the University of South Dakota (USD) Law School, Converse sent a letter to then assistant dean Diane May regarding certain issues—not relevant to this appeal—that he had had with the law school during fall classes, closing that letter with the phrase, "Hope you get a full body tan in Costa Rica." Subsequent to that note, Converse had several more encounters with May, beginning with his writing letters to May about receiving grades lower than what he believed he had earned in an appellate advocacy class.

After he received a grade he believed to be unjustified by his performance in the appellate advocacy course, Converse wrote letters to May and to the USD law school dean, Barry Vickrey, requesting assistance with an appeal of that grade. In addition to writing letters to Vickrey and May, Converse also sent a letter to the South Dakota Supreme Court regarding the appellate advocacy course professor's characterization of his arguments, with indications that carbon copies of the letter were sent to two well-known federal court of appeals judges. The letter was written to suggest the professor believed her stance on certain issues was more enlightened than that of the judges. Converse sent numer-

ous correspondence to various people regarding the grade appeal against the specific professor. Despite all such correspondence, Converse testified at the hearing that no formal appeal of the grievance was ever filed. Converse's grade was never adjusted.

The evidence showed that following the grade "appeal," Converse prepared a memorandum and submitted it to his classmates, urging them to recall an "incident" in which yet another professor lashed out at him in class, and to be cognizant of the image that incident casts "on [that professor's] core professionalism" prior to completing class evaluations. Converse also wrote a letter to a newspaper in South Dakota, the Sioux Falls Argus Leader, regarding a proposed fee increase at the USD law school. Converse immediately began investigating the salaries of USD law professors and posted a list of selected professors' salaries on the student bulletin board, as well as writing a letter that accused Vickrey of trying to pull a "fast one."

Converse's next altercation at the USD law school involved a photograph of a nude female's backside that he displayed in his study carrel in the USD law library. The picture was removed by a law librarian. In response to the removal of this photograph, Converse contacted the American Civil Liberties Union (ACLU) and received a letter indicating that his photograph might be a protected expression under the First Amendment. Once again, Converse went to the student newspaper to alert the student body of the actions of the law school authorities, accusing them of unconstitutional censorship.

Converse redisplayed the photograph once it was returned by the law librarians. Vickrey received several complaints about the photograph from other students, classifying Converse's behavior as "unprofessional and inappropriate." Upon Converse's redisplay of the photograph, Vickrey sent him a memorandum explaining that the picture would not be removed only because Vickrey did not want to involve the school in controversy during final examinations. Converse testified that he redisplayed the photograph in order to force the alleged constitutional issue.

The evidence also revealed that Converse filed an ethics complaint with the North Dakota Bar Association regarding certain correspondence between Vickrey and a retired justice of the

North Dakota Supreme Court. The complaint was dismissed. Converse went to the USD student newspaper, claiming that a letter from a retired North Dakota justice to the ACLU, in response to questions from Vickrey, was a violation of professional ethics (apparently Model Rules of Professional Conduct Rule 4.2 (1999), which precludes a lawyer from discussing matters with opposing parties the lawyer knows to be represented by counsel). In addition to going to the press, Converse also contacted the president of USD, referring to Vickrey as an "incompetent" and requesting that Vickrey be fired. In addition to this incident, Converse reported his suspicions about USD's student health insurance policy to the student newspaper under the title of "Law Student Suspects Health Insurance Fraud," as well as in a separate article alleging that USD had suppressed an investigation of its insurance carrier.

The Commission also heard testimony regarding Converse's attempt to obtain an internship with the U.S. Attorney's office in South Dakota. Converse arranged for the internship on his own, only to have his request subsequently rejected by the law school. Upon receiving his denial, Converse sent a complaint to all of USD's law school faculty members. Vickrey testified that Converse's internship was rejected because he failed to comply with the law school's procedures regarding internships. Converse then contacted the chairperson of the law school committee of the South Dakota State Bar Association with his complaint, expressly referring to Vickrey as being "arrogant." There is no indication of a response from the chairperson in the record.

The issue next considered by the Commission was that of various litigation threatened by Converse. Converse indicated that he would "likely" be filing a lawsuit against Vickrey for violations of his First Amendment rights. Converse was also involved in a dispute with other law students, in which he threatened to file a lawsuit and warned the students that all lawsuits in which they were involved would need to be reported to proper authorities when they applied to take a bar examination. Further, Converse posted signs on the bulletin board at the law school denouncing a professor, in response to the way in which Converse's parking appeal was handled, and then went to the

student newspaper to criticize the process and those involved in that appeal.

One of the final issues addressed by the Commission in its hearing was that of a T-shirt Converse produced and marketed on which a nude caricature of Vickrey is shown sitting astride what appears to be a large hotdog. The cartoon on the shirt also contains the phrase "Astride the Peter Principle," which Converse claims connotes the principle that Vickrey had been promoted past his level of competence; however, Converse admits that the T-shirt could be construed to have certain sexual overtones. Converse admitted that the creation of this T-shirt would not be acceptable behavior for a lawyer.

In response to not being allowed to post signs and fliers at the law school, Converse sent a memo to all law students in which he noted to his fellow students that his "Deanie on a Weanie" T-shirts were in stock. In that same memo, Converse included a note to his schoolmates:

> So far 4 causes of action have arisen, courtesy Tricky Vickrey. [He then listed what he believed the causes of action to be.] When you pass the SD Bar, if you want to earn some atty [sic] fees, get hold of me and we can go for one of these. I've kept evidence, of course.

Vickrey asked Converse not to wear his T-shirt to his graduation ceremony, and Converse decided that "it would be a better choice in [his] life not to go to that commencement." Converse acknowledges that Vickrey's request was made in a civil manner.

The evidence also revealed that prior to law school, Converse, in his capacity as a landlord, sued a tenant for nonpayment of rent and referred to the tenant as a "fucking welfare bitch." At the hearing, in response to questioning from the Commission, Converse testified at great length as to how he tends to personally attack individuals when he finds himself embroiled in a controversy.

After the Commission notified Converse on December 18, 1998, that he would not be allowed to sit for the Nebraska bar examination, Converse appealed the adverse determination to this court pursuant to Neb. Ct. R. for Adm. of Attys. 15 (rev. 1996).

## ASSIGNMENTS OF ERROR

Converse claims, restated and renumbered, that the Commission erred in (1) basing its decision, in part, upon conduct and speech arguably protected by the First Amendment; (2) not making Converse aware of all of the "charges" against him in the proceedings in violation of the 14th Amendment; and (3) determining that Converse's conduct gave rise to sufficient cause under Nebraska law for the Commission to deny his application to sit for the Nebraska bar examination.

## STANDARD OF REVIEW

Under rule 15, this court will consider the appeal of an applicant from a final adverse ruling of the Commission de novo on the record made at the hearing before the Commission. *In re Application of Collins-Bazant*, 254 Neb. 614, 578 N.W.2d 38 (1998). When reviewing such a determination, we reach a conclusion independent of the findings of the Commission; however, where credible evidence is in conflict on a material issue of fact, we consider and may give weight to the fact that the Commission heard and observed the witnesses and accepted one version of the facts rather than another. *In re Appeal of Lane*, 249 Neb. 499, 544 N.W.2d 367 (1996).

## ANALYSIS

Converse first assigns as error that the Commission's determination should not stand because it is based in large part upon speech that is protected by the First Amendment. Thus, the threshold question we must answer is whether conduct arguably protected by the First Amendment can be considered by the Commission during an investigation into an applicant's moral character and fitness to practice law. We answer this question in the affirmative.

There are four U.S. Supreme Court cases that provide particular guidance with respect to this issue. In *Konigsberg v. State Bar*, 366 U.S. 36, 81 S. Ct. 997, 6 L. Ed. 2d 105 (1961), the bar applicant argued that when the California bar commission forced him to either answer questions about his affiliation with the Communist Party or face the repercussions of not being

certified as possessing the required moral character to sit for the bar, the commission violated his First Amendment rights. The Supreme Court disagreed, pointing out that "regulatory statutes, not intended to control the content of speech but incidentally limiting its unfettered exercise, have not been regarded as the type of law the First or Fourteenth Amendment [forbids] . . . when they have been found justified by subordinating valid governmental interests." 366 U.S. at 50-51. In the context of a character inquiry, "it is difficult, indeed, to imagine a view of the constitutional protections of speech and association which would automatically . . . exclude all reference to prior speech or association on such issues as character, purpose, credibility, or intent." 366 U.S. at 51. The Court balanced the effect of allowing such questions against the need for the state to do a complete inquiry into the character of an applicant and concluded that questions about membership would not chill association to the extent of harm caused by striking down the screening process. *Id.* The Court held that requiring the applicant to answer the questions was not an infringement of the applicant's First Amendments rights.

In 1971, the Court was once again confronted with the issue and decided a trilogy of cases concerning the bar admissions procedures of various states. See, *Baird v. State Bar of Arizona*, 401 U.S. 1, 91 S. Ct. 702, 27 L. Ed. 2d 639 (1971); *In re Stolar*, 401 U.S. 23, 91 S. Ct. 713, 27 L. Ed. 2d 657 (1971); *Law Students Research Council v. Wadmond*, 401 U.S. 154, 91 S. Ct. 720, 27 L. Ed. 2d 749 (1971). It was the final case in this trilogy, *Law Students Research Council v. Wadmond*, that clarified the law as to the appropriate depth of a state bar commission's inquiry on an applicant's moral character. The Court declined to uphold a First Amendment attack against the admission procedure of the New York bar association. The Court upheld the statute, which required that the admitting authority be " 'satisfied that [the applicant] possesses the character and general fitness requisite for an attorney and counsellor-at-law.' " 401 U.S. at 156. The Court declared that a state is constitutionally entitled to make such an inquiry of an applicant for admission to the bar and placed its imprimatur upon a state's con-

ducting a preliminary inquiry into the moral character of those seeking admission. *Id.*

Converse conceded at oral argument that the Commission's decision cannot be based solely on an applicant's exercise of First Amendment freedoms but that it is proper for the Commission to go behind the exercise of those freedoms and consider an applicant's moral character. That is exactly what was done by the Commission in the instant case. An investigation of Converse's moral character is not a proceeding in which the applicant is being prosecuted for conduct arguably protected by the First Amendment, but, rather, "an investigation of the conduct of [an applicant] for the purpose of determining whether he shall be [admitted]." See *In re Doss*, 367 Ill. 570, 572, 12 N.E.2d 659, 660 (1937). Converse's reliance upon cases where a judgment was invalidated at least in part because it was based on conduct protected by the First Amendment is therefore misplaced.

 Were we to adopt the position asserted by Converse in this case, the Commission would be limited to conducting only cursory investigations of an applicant's moral character and past conduct. Justice Potter Stewart, writing for the majority in *Law Students Research Council v. Wadmond, supra*, noted that the implications of such an attack on a bar screening process are that no screening process would be constitutionally permissible beyond academic examination and an extremely minimal check for serious, concrete character deficiencies. "The principle means of policing the Bar would then be the deterrent and punitive effects of such post-admission sanctions as contempt, disbarment, malpractice suits, and criminal prosecutions." 401 U.S. at 167. Assuming but not deciding that Converse's conduct may have been protected by the First Amendment to the U.S. Constitution, *Law Students Research Council v. Wadmond, supra*, makes clear that a bar commission is allowed to consider speech and conduct in making determinations of an applicant's character, and that is precisely what has occurred in the instant case. As aptly stated by the South Dakota Supreme Court in *In re Egan*, 24 S.D. 301, 326-27, 123 N.W. 478, 488 (1909):

> [T]here can be such an abuse of the freedom of speech and liberty of the press as to show that a party is not possessed

"of good moral character," as required for admission to the bar of this state . . . and therefore to require that such person be excluded from the bar of this state; and to our mind the evidence submitted here shows such an instance. . . . "Nor can the respondent be justified on the ground of guaranteed liberty of speech. When a man enters upon a campaign of villification, he takes his fate into his own hands, and must expect to be held to answer for the abuse of the privilege extended to him by the Constitution. . . ."

We conclude that the Commission properly considered Converse's conduct as it reflects upon his moral character, even if such conduct might have been protected by the First Amendment. Converse's first assignment of error is therefore without merit.

Converse next contends that the Commission violated his due process rights by not making him aware of all of the "charges" against him in these proceedings. This argument is basically that when the Commission determined that he lacked the requisite moral character and gave some examples as to why they reached such a determination, they should have provided an all-inclusive list delineating every reason on which their decision was based. We conclude that such a procedure is not required.

By alleging that he has not been made fully aware of the "charges" against him, Converse has confused this inquiry into his moral character with a trial. Such is not the case. An inquiry regarding an application to the bar is not a lawsuit with the formalities of a trial, but, rather, is an investigation of the conduct of an applicant for membership to the bar for the purpose of determining whether he shall be admitted. See *In re Doss*, 367 Ill. 570, 12 N.E.2d 659 (1937). No charges have been filed against Converse, and he has been advised of the reasons for which his application was denied. Converse's assignment of error that he has been denied due process of law is therefore without merit.

Converse's third assignment of error alleges that the Commission erred by determining there was sufficient cause to deny his application to sit for the Nebraska bar exam. Much of his argument centers around his conduct being protected by the First Amendment, as discussed previously. However, the ques-

tion presented is not the scope of Converse's rights under the First Amendment, but whether Converse's propensity to unreasonably react against anyone whom he believes opposes him reveals his lack of professional responsibility, which renders him unfit to practice law. See *In re Martin-Trigona*, 55 Ill. 2d 301, 302 N.E.2d 68 (1973).

There is no question that "[a] state can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar . . . ." *Schware v. Board of Bar Examiners*, 353 U.S. 232, 239, 77 S. Ct. 752, 1 L. Ed. 2d 796 (1957). The Court has also stated that it must be "kept clearly in mind . . . that an applicant for admission to the bar bears the burden of proof of 'good moral character'—a requirement whose validity is not, nor could well be, drawn in question here." *Konigsberg v. State Bar*, 366 U.S. 36, 40-41, 81 S. Ct. 997, 6 L. Ed. 2d 105 (1961). "If at the conclusion of the proceedings the evidence of good character and that of bad character are found in even balance, the State may refuse admission . . . ." 366 U.S. at 42. Nebraska does, in fact, require a bar applicant to show that the applicant is of good moral character. See, *In re Application of Majorek*, 244 Neb. 595, 508 N.W.2d 275 (1993); Neb. Rev. Stat. § 7-102 (Reissue 1997). Therefore, the burden is upon Converse to adequately prove his fitness to practice law in Nebraska, and the evidence will be viewed in this light.

The legal reality is that this court, and only this court, is vested with the power to admit persons to the practice of law in this state and to fix qualifications for admission to the Nebraska bar. *In re Application of Collins-Bazant*, 254 Neb. 614, 578 N.W.2d 38 (1998); *In re Application of Majorek, supra*. With that in mind, we commence our analysis with the standards for moral character required for admission to the Nebraska bar as set out in our rules governing the admission of attorneys. Neb. Ct. R. for Adm. of Attys. 3 (rev. 1998) governs this situation, which provides in pertinent part:

> An attorney should be one whose record of conduct justifies the trust of clients, adversaries, courts, and others with respect to the professional duties owed to them. A record manifesting a significant deficiency by an applicant

in one or more of the following essential eligibility requirements for the practice of law may constitute a basis for denial of admission. In addition to the admission requirements otherwise established by these Rules, the essential eligibility requirements for admission to the practice of law in Nebraska are:

(a) The ability to conduct oneself with a high degree of honesty, integrity, and trustworthiness in all professional relationships and with respect to all legal obligations;

. . . .

(c) The ability to conduct oneself with respect for and in accordance with the law and the Code of Professional Responsibility;

. . . .

(j) The ability to conduct oneself professionally and in a manner that engenders respect for the law and the profession.

Under rule 3, Converse must prove that his past conduct is in conformity with the standards set forth by this court, and the record in this case compels the conclusion that he has failed to do so.

We considered an appeal of a similarly situated bar applicant in *In re Appeal of Lane*, 249 Neb. 499, 544 N.W.2d 367 (1996). *In re Appeal of Lane* involved an individual seeking readmission to the Nebraska bar whose past included confrontations with law school faculty, the use of strong and profane language with fellow students at his bar review course, the use of intimidating and rude conduct directed at a security guard at the place where he was taking his bar review course, and some controversial interactions with females. We held that, taken together, "these incidents show that Lane is prone to turbulence, intemperance, and irresponsibility, characteristics which are not acceptable in one who would be a counselor and advocate in the legal system," and we upheld the denial of his application. *Id.* at 510, 544 N.W.2d at 374.

We explained in *In re Appeal of Lane*, 249 Neb. at 511, 544 N.W.2d at 375, that the "requisite restraint in dealing with others is *obligatory conduct for attorneys* because '[t]he efficient and orderly administration of justice cannot be success-

fully carried on if we allow attorneys to engage in unwarranted attacks on the court [or] opposing counsel . . . . Such tactics seriously lower the public respect for . . . the Bar.' " (Emphasis supplied.) (Quoting *Application of Feingold*, 296 A.2d 492 (Me. 1972).) Furthermore, " '[a]n attorney who exhibits [a] lack of civility, good manners and common courtesy . . . tarnishes the . . . image of . . . the bar . . . .' " *Id.* (Quoting *In re McAlevy*, 69 N.J. 349, 354 A.2d 289 (1976).) We held in *In re Appeal of Lane*, 249 Neb. at 512, 544 N.W.2d at 375, that "abusive, disruptive, hostile, intemperate, intimidating, irresponsible, threatening, or turbulent behavior is a proper basis for the denial of admission to the bar." *Id.* Expanding on this holding, we stated:

"Care with words and respect for courts and one's adversaries is a necessity, not because lawyers and judges are without fault, but because trial by combat long ago proved unsatisfactory.

. . . .

"The profession's insistence that counsel show restraint, self-discipline and a sense of reality in dealing with courts, other counsel, witnesses and adversaries is more than insistence on good manners. It is based on the knowledge that civilized, rational behavior is essential if the judicial system is to perform its function. Absent this, any judicial proceeding is likely to degenerate into [a] verbal free-for-all . . . . [H]abitual unreasonable reaction to adverse rulings . . . is conduct of a type not to be permitted of a lawyer when acting as a lawyer. *What cannot be permitted in lawyers, cannot be tolerated in those applying for admission as lawyers.*"

(Emphasis supplied.) 249 Neb. at 513, 544 N.W.2d at 376. In Nebraska, *In re Appeal of Lane* is clearly the rule and not an exception thereto. See, *In re Complaint Against Jones*, 255 Neb. 1, 581 N.W.2d 876 (1998); *In re Application of Majorek*, 244 Neb. 595, 508 N.W.2d 275 (1993).

The evidence in this case shows that Converse's numerous disputes and personal attacks indicate a "pattern and a way of life which appear to be [Converse's] normal reaction to opposition and disappointment." See *In re Appeal of Lane*, 249 Neb. 499, 512, 544 N.W.2d 367, 376 (1996). The totality of the evi-

dence clearly establishes that Converse possesses an inclination to personally attack those with whom he has disputes. Such inclinations "are not acceptable in one who would be a counselor and advocate in the legal system." *Id.* at 510, 544 N.W.2d at 374.

In addition to Converse's tendency to personally attack those individuals with whom he has disputes, his pattern of behavior indicates an additional tendency to do so in arenas other than those specifically established within the legal system. This tendency is best exemplified by observing Converse's conduct in situations where there were avenues through which Converse could have and should have handled his disputes, but instead chose to mount personal attacks on those with whom he had disputes through letters and barrages in the media.

One such incident occurred when Converse received the below average grade in the appellate advocacy course, and he wrote letters to various individuals regarding his arguments. Converse testified that he wrote letters to members of the South Dakota Supreme Court, Judge Richard Posner, Judge Alex Kozinski, and others, but filed no formal appeal. Moreover, upon return of the nude photograph, Converse testified that he redisplayed the photograph to force the issue with the university, but chose not to pursue any action regarding the alleged violation of his rights. There was also the incident regarding Converse's internship with the U.S. Attorney's office, where Converse went outside established procedures, arranged for the internship on his own, and then complained to all faculty and to members of the South Dakota bar when his request was denied for not complying with established procedures. Finally, there was Converse's production and marketing of the T-shirt containing a nude depiction of Vickrey on a hotdog as a result of the ongoing tension between Vickrey and himself. Converse is 48 years old, and his actions cannot be excused as isolated instances of youthful indiscretions.

Taken together with the other incidents previously discussed, the evidence clearly shows that Converse is prone to turbulence, intemperance, and irresponsibility, characteristics which are not acceptable in one seeking admission to the Nebraska bar. See *In re Appeal of Lane, supra.* In light of Converse's admission that

such conduct would be inappropriate were he already an attorney, we reiterate that we will not tolerate conduct by those applying for admission to the bar that would not be tolerated were that person already an attorney. See *id.* Furthermore, Converse has consistently exhibited a tendency to cause disruption and then go to some arena outside the field of law to settle the dispute, often to an arena not specifically designed for dispute resolution. As explained by Justice Stewart in *Law Students Research Council v. Wadmond*, 401 U.S. 154, 166, 91 S. Ct. 720, 27 L. Ed. 2d 749 (1971),

> a State is constitutionally entitled to make . . . an inquiry [into the moral character and past conduct] of an applicant for admission to a profession dedicated to the peaceful and reasoned settlement of disputes between men, and between a man and his government. The very Constitution that the appellants invoke stands as a living embodiment of that ideal.

The record before us reflects that the Commission conducted such an inquiry and, at the conclusion thereof, correctly determined that Converse possessed a moral character inconsistent with one "dedicated to the peaceful and reasoned settlement of disputes," see 401 U.S. at 166, but, rather, more consistent with someone who wishes to go outside the field of law and settle disputes by mounting personal attacks and portraying himself as the victim and his opponent as the aggressor. Such disruptive, hostile, intemperate, threatening, and turbulent conduct certainly reflects negatively upon those character traits the applicant must prove prior to being admitted to the Nebraska bar, such as honesty, integrity, reliability, and trustworthiness. See *In re Appeal of Lane*, 249 Neb. 499, 544 N.W.2d 367 (1996). See, also, rule 3.

The result might have been different if Converse had exhibited only a "single incident of rudeness or lack of professional courtesy," see *In re Snyder*, 472 U.S. 634, 647, 105 S. Ct. 2874, 86 L. Ed. 2d 504 (1985), but such is simply not the case. The record clearly establishes that he seeks to resolve disputes not in a peaceful manner, but by personally attacking those who oppose him in any way and then resorting to arenas outside the field of law to publicly humiliate and intimidate those oppo-

nents. Such a pattern of behavior is incompatible with what we have required to be obligatory conduct for attorneys, as well as for applicants to the bar.

Converse has exhibited a clear lack of self-restraint and lack of judgment, and our de novo review of the record leads us to independently conclude that Converse has exhibited such a pattern of acting in a hostile and disruptive manner as to render him unfit for the practice of law in Nebraska. We conclude that the Commission's determination to deny Converse's application was correct, and Converse's third assignment of error is therefore without merit.

## CONCLUSION

The Commission correctly determined that Converse possessed insufficient moral character and was unfit to practice law in the State of Nebraska. This determination was based on an inquiry into Converse's moral character that was both proper and constitutionally permissible. Finding no error in the Commission's determination or the process used to reach that determination, we affirm the Commission's denial of application.

AFFIRMED; APPLICATION DENIED.