In re Application of Charles J. Antonini III for Admission to the Nebraska State Bar.

726 N.W.2d 151

Filed January 19, 2007. No. S-34-060002.

Robert W. Mullin and David S. Houghton, of Lieben, Whitted, Houghton, Slowiaczek & Cavanagh, P.C., L.L.O., for applicant.

Jon Bruning, Attorney General, and Tom Stine for Nebraska State Bar Commission.

HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

PER CURIAM.

## I. NATURE OF CASE

Charles J. Antonini III appeals the decision of the Nebraska State Bar Commission (Commission) denying his application for admission to the Nebraska State Bar Association (Bar Association). Antonini claims that the Commission erred in finding that he does not possess the present character and fitness to be admitted to the Bar Association. We affirm the decision of the Commission.

## II. BACKGROUND

Antonini obtained his law degree from Creighton University School of Law in May 2005, and he applied to take the July 2005 Nebraska bar examination. After reviewing Antonini's application, the Commission permitted Antonini to sit for the examination, pending an ongoing investigation into his character and fitness. The Commission's investigation into Antonini's character and fitness included an inquiry into three prior incidents in Antonini's past that resulted in criminal charges and university suspensions, as well as his honesty on his law school applications. The Commission also required Antonini to undergo a psychological and chemical dependency evaluation.

### 1. INVESTIGATION

#### (a) Prior Incidents

In his application, Antonini answered yes to the following questions:

9. Have you ever been dropped, suspended, warned, placed on scholastic or disciplinary probation, expelled or requested to resign or allowed to resign in lieu of discipline from any school above the elementary school level, college or university, or otherwise subjected to discipline

by any such school or institution or requested or advised by any such school or institution to discontinue your studies therein?

. . . .

11. Despite whether the record has been expunged, canceled or annulled, or whether no record was made, have you ever been subject to proceedings before a school honor court or council (or any similar body)?

. . . .

20. Have there ever been or are there now pending any civil actions or have any judgments been filed against you or have you ever filed any civil action against another party?

The incidents giving rise to Antonini's answers to questions Nos. 9, 11, and 20 occurred between 1997 and 2002, during the time Antonini was living in California; then while enrolled as an undergraduate at George Washington University in Washington, D.C.; and, finally, while enrolled as a first year law student at Syracuse University in New York. These incidents are briefly summarized below for background purposes.

### (i) 1997 Incident

In May 1997, when he was 19 years old, Antonini was arrested and charged with brandishing a deadly weapon and the destruction of property. Antonini ultimately pled no contest to destruction of property. These charges and conviction stemmed from an altercation between Antonini and another individual whose car Antonini damaged when he threw a bottle at it.

### (ii) George Washington University Incident

In December 1997, Antonini, then a student at George Washington University, was charged with burglary, assault, making threats, possession of a prohibited weapon (a butter knife), destroying property (a chair), unlawful entry, and stalking. Antonini pled no contest to destruction of property and stalking, and the remaining charges were dropped. Antonini was ordered to attend domestic violence and anger management counseling, stay away from the victim, pay restitution for the chair, pay a $100 fine, and serve 9 months' probation. The record reflects that Antonini went to a fellow student's dormitory

room and an altercation between him and the student ensued. In the record before us, however, the specifics of the incident are conflicting.

The incident report prepared by the Washington, D.C., police department described the events as follows. After Antonini entered the victim's dormitory room uninvited, an altercation occurred and Antonini grabbed the victim, threw her onto the bed, and attempted to jump on her. The victim kicked Antonini off, and Antonini grabbed a knife and threw it at her. The victim attempted to leave, and Antonini blocked her path by picking up a chair and slamming it on the floor, causing it to break. Antonini then began striking himself on the head with the broken chair leg. The victim again attempted to leave, knocking Antonini over a chair. Antonini, however, continued to block her escape. The victim began to scream for help, and Antonini exited the room.

In his statement to the police, Antonini stated that the victim had not asked him to leave the room, that they had not engaged in a heated argument, that he had not prevented her from leaving the room, that he had not thrown a knife at her, that he had not pushed her onto the bed, and that he had not hit himself with the chair leg. He did admit, however, to breaking a chair.

In his application for admission to the bar, Antonini explained that in December 1997, he received a telephone call from the victim who was upset, that she threatened to kill herself, and that she invited him to her dormitory room. Antonini claimed that after the victim invited him into her room, their conversation became heated and, in his frustration, he knocked over the chair he was leaning on, causing one of its legs to break.

At the hearing, Antonini testified that he swung the chair to the side and that it hit a wall, causing one of the legs to break. Antonini stated that after he broke the chair, he told the victim he was leaving, and that as he started to walk out the door, the victim began to strike him with the chair leg. He further testified that as a result of this altercation, he was suspended from George Washington University for 6 months.

### (iii) Syracuse University Incident

In May 2002, while a first-year law student at Syracuse University, Antonini was arrested and charged with aggravated

harassment and harassment. These charges, which Antonini testified were ultimately dropped, stemmed from an altercation between Antonini and two fellow law school classmates, Sarah W. and Richard S.

Antonini testified at the hearing that he had attempted to end a romantic relationship with Sarah. He stated that after he had been drinking, he called Sarah, who agreed to meet him. At that time, Richard got on the telephone and began calling Antonini names, including a "son of a bitch." Antonini testified that he then went to Sarah's residence and that pursuant to his request his roommate delivered a note to Sarah.

In his bar application, Antonini stated that when Richard called him a "son of a bitch," he demanded an apology, which Richard declined to give. He stated that he then drafted a note to Richard "demanding [Richard] apologize for his accusations and that [Antonini] no longer intended to carry on a relationship with [Sarah]." In contrast, in a written statement to the Syracuse University's department of public safety, Antonini stated that he wrote Richard a note "about [Richard's] backing up his allegations of [Antonini's] mother being a Bitch." The note states verbatim, including grammatical errors, "Son of A Bitch Whatch your Ass Bit — My MA! Fuck You Fag — I'll Fuck You up." Upon the Commission's receipt of the letter from Syracuse University, Antonini issued a written declaration, further explaining the letter. Antonini explained that the note directed at Richard was in response to language used by Richard when telling Antonini what Richard would do to Antonini and that it "returned his specific language to him."

As previously noted, Antonini faced criminal charges of aggravated harassment and harassment as a result of this incident. Antonini testified that these charges were ultimately dismissed. Antonini was also subject to a civil protection order which limited his contact with Sarah. Additionally, he faced disciplinary actions by Syracuse University on the ground that he violated the university's code of student conduct. The record reflects that Antonini was placed on what the university referred to as an interim suspension. Antonini requested an appeal of his interim suspension, and following the hearing, the university appeals

board issued an opinion in which the board affirmed Antonini's interim suspension.

(b) Law School Application Inaccuracies

Following Antonini's suspension from Syracuse University, Antonini applied to and was admitted to Creighton University School of Law.

In his application to the law school, Antonini answered yes to the following question: "Have you ever been convicted of any crime other than a minor traffic violation? (You must include all offenses involving alcohol. If you are not sure about the nature or the ultimate disposition of a particular charge, it is your responsibility to check with the courts before you answer.)" The application requested that if an applicant answered yes to this question, the applicant was to attach a separate sheet giving the dates, cause, outcomes, and circumstances related to the event. On a separate sheet, Antonini referred the reader to his statement in a prior application to Creighton University School of Law, explaining events occurring before his earlier application. In his earlier application, Antonini answered no to the above-quoted question. Accordingly, there was no statement to which a reader could refer for an explanation of Antonini's conviction.

At the hearing, Antonini testified that he had answered no to the question in his earlier application because he believed that because the convictions had been expunged, he had not been convicted. He also testified that he had not sought legal advice regarding what it meant to be convicted. With regard to the later application, Antonini testified that he answered yes to the question because he understood then that he had been convicted of the 1997 charges. He explained that in the later application, he referred to his earlier application for an explanation of the charges, even though he had answered no on that application because he thought that he had answered yes to the question in his earlier application.

Patrick Borchers, dean of Creighton University School of Law, testified on Antonini's behalf regarding Antonini's applications to that school. Borchers testified that since Antonini had applied to the law school, the school has changed its application so that it now asks an applicant if he or she has ever

been charged, even if that charge has been expunged. Borchers explained that the previous version of the application used by the law school, which asked applicants if they had ever been convicted of a crime, caused too many problems. This was because a minor offense may get expunged or dismissed, and there were many circumstances when applicants would answer no to the question in good faith and would subsequently have problems when they came before the Commission. When questioned by the Commission, however, Borchers testified that he did not learn the details of Antonini's convictions until approximately 1 to 2 weeks before the hearing, when he spoke with Antonini's attorney. Borchers also testified that at no time did Antonini come to him to request an amendment to his law school applications.

## 2. DENIAL OF ADMISSION

Antonini received a passing score on the bar examination, but was denied admission to the Bar Association on the basis that he did not possess the present character and fitness for admission. In particular, the Commission concluded that Antonini has significant deficiencies in the following eligibility requirements set forth in Neb. Ct. R. for Adm. of Attys. 3 (rev. 2005), which states in relevant part:

> (c) The ability to conduct oneself with respect for and in accordance with the law and the Nebraska Rules of Professional Conduct;
>
> . . . .
>
> (f) The ability to exercise good judgment in conducting one's professional business;
>
> (g) The ability to avoid acts that exhibit disregard for the health, safety, and welfare of others;
>
> . . . .
>
> (j) The ability to conduct oneself professionally and in a manner that engenders respect for the law and the profession.

Pursuant to Neb. Ct. R. for Adm. of Attys. 10 (rev. 2000), Antonini requested a hearing on the denial of his admission. The hearing was held on November 9, 2005, and continued until March 29, 2006. Following Antonini's appeal hearing, the Commission again denied Antonini admission to the Bar Association. This denial was based on Antonini's failure to

comply with rule 3(a), which is "[t]he ability to conduct oneself with a high degree of honesty, integrity, and trustworthiness in all professional relationships and with respect to all legal obligations," as well as rules 3(c), (f), (g), and (j).

Pursuant to rule 10 and Neb. Ct. R. for Adm. of Attys. 15 (rev. 2000), Antonini perfected the present appeal.

### III. ASSIGNMENTS OF ERROR

Antonini assigns that the Commission erred in concluding that he does not possess the present character and fitness to be admitted to the Bar Association.

### IV. STANDARD OF REVIEW

■ Under rule 15, the Nebraska Supreme Court considers the appeal of an applicant from a final adverse ruling of the Commission de novo on the record made at the hearing before the Commission. *In re Application of Roseberry*, 270 Neb. 508, 704 N.W.2d 229 (2005).

### V. ANALYSIS

■ This court has delegated the administrative responsibility for bar admissions solely to the Commission. *In re Application of Silva*, 266 Neb. 419, 665 N.W.2d 592 (2003). However, this court remains vested with the sole power to admit persons to the practice of law in this state and to fix qualifications for admission to the Nebraska bar. *Id.*

Pursuant to Nebraska statutory law, "[n]o person shall be admitted . . . unless it is shown to the satisfaction of the Supreme Court that such person is of good moral character." Neb. Rev. Stat. § 7-102(1) (Cum. Supp. 2006). Rule 3, which governs the admission of attorneys, describes the applicable standards for character and fitness of attorneys as follows:

> An attorney should be one whose record of conduct justifies the trust of clients, adversaries, courts, and others with respect to the professional duties owed to them. A record manifesting a significant deficiency by an applicant in one or more of the following essential eligibility requirements for the practice of law may constitute a basis for denial of admission.

The rule 3 requirements include:

(a) The ability to conduct oneself with a high degree of honesty, integrity, and trustworthiness in all professional relationships and with respect to all legal obligations;

. . . .

(c) The ability to conduct oneself with respect for and in accordance with the law and the Nebraska Rules of Professional Conduct;

. . . .

(f) The ability to exercise good judgment in conducting one's professional business;

(g) The ability to avoid acts that exhibit disregard for the health, safety, and welfare of others;

. . . .

(j) The ability to conduct oneself professionally and in a manner that engenders respect for the law and the profession.

The character and fitness standards are further clarified by appendix A to the rules for admission of attorneys:

The primary purposes of character and fitness screening before admission to the bar of Nebraska are to assure the protection of the public and to safeguard the justice system. . . . The public is adequately protected only by a system that evaluates character and fitness as those elements relate to the practice of law. The public interest requires that the public be secure in its expectation that those who are admitted to the bar are worthy of the trust and confidence clients may reasonably place in their attorneys.

Our "rules place on the applicant ' "the burden of proving good character by producing documentation, reports, and witnesses in support of the application." ' " *In re Application of Roseberry*, 270 Neb. 508, 516, 704 N.W.2d 229, 235 (2005), quoting *In re Application of Silva, supra.* " ' "A record manifesting a significant deficiency in the honesty, trustworthiness, diligence, or reliability of an applicant may constitute a basis for denial of admission." ' " *Id.* at 516, 704 N.W.2d at 234, quoting *In re Application of Silva, supra.*

Reflecting adversely on Antonini's character and fitness to practice law is his history of intemperate behavior. We have held that " 'abusive, disruptive, hostile, intemperate, intimidating,

irresponsible, threatening, or turbulent behavior is a proper basis for the denial of admission to the bar.' " *In re Application of Silva*, 266 Neb.. at 427, 665 N.W.2d at 598, quoting *In re Appeal of Lane*, 249 Neb. 499, 544 N.W.2d 367 (1996).

Antonini has been involved in three serious incidents involving abusive, disruptive, hostile, intemperate, intimidating, irresponsible, threatening, and turbulent behavior. In each of these incidents, Antonini showed complete disregard for others as well as a lack of self-control. Two of these incidents occurred approximately 9 years ago; however, the most recent occurred in 2002, while Antonini was a first-year law student.

The court is also concerned with Antonini's lack of candor. The record reflects that Antonini's admission and description of the incidents described above have been less than forthcoming during his law school and bar application processes.

We have stated that a lack of candor in completing applications to the bar may constitute a ground for a finding of lack of requisite character and fitness. See, *In re Application of Silva*, 266 Neb. 419, 665 N.W.2d 592 (2003); *In re Application of Majorek*, 244 Neb. 595, 508 N.W.2d 275 (1993).

As previously described, Antonini was less than candid in his applications to Creighton University School of Law when he failed to provide full disclosure · of his misdemeanor record. Antonini's explanation as to why he failed to provide full disclosure is less than credible. Antonini was also not fully candid in his bar application when he failed to honestly describe the nature of the note he wrote to Richard. In his application, Antonini described the note as a demand for an apology, but the note can only be interpreted as a threat, not a demand for an apology.

Antonini has continually tried to justify and gloss over his lack of candor. We therefore conclude that the Commission did not err in determining Antonini should not be admitted to the Bar Association.

APPLICATION DENIED.