781 N.W.2d 446 (2010)
279 Neb. 758
In re Application of Anthony YBARRA for Admission to the Nebraska State Bar on Examination.
No. S-34-090002.
Supreme Court of Nebraska.
April 23, 2010.
*447 Robert B. Creager, of Anderson, Creager & Wittstruck, P.C., Lincoln, for applicant.
Brad Roth, Lincoln, and Chris F. Blomenberg, of McHenry, Haszard, Hansen, Roth & Hupp, P.C., for Nebraska State Bar Commission.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
PER CURIAM.

I. NATURE OF CASE
Anthony Ybarra appeals the decision of the Nebraska State Bar Commission (Commission) denying his application to take the Nebraska bar examination. The Commission determined that Ybarra did not meet the character and fitness requirements for admission to the bar. We affirm the Commission's denial of Ybarra's application to take the Nebraska bar examination.

II. BACKGROUND
Ybarra attended Chadron State College and received a bachelor's degree in May *448 2005. He began law school at the University of Nebraska in August 2005 and graduated in December 2008. He applied to take the Nebraska bar examination in February 2009. The Commission scheduled an interview with Ybarra to address his history of contacts with law enforcement, allegations of domestic abuse, and his credit history. After the Commission voted to deny his application, Ybarra requested and the Commission granted a formal hearing. The following evidence was received at the hearing.

1. ALLEGATIONS AGAINST YBARRA (a) D.G.
Prior to attending law school, Ybarra worked as a police officer with the Scottsbluff Police Department from December 1997 to March 2003. During this time. Ybarra had an intimate relationship with a woman who will be referred to as "D.G." The relationship ended in August 1999. In August 2001, D.G. twice filed a petition for a protection order against Ybarra. The petitions were denied. In an affidavit in support of one of the protection orders, D.G. reported incidents of Ybarra's harassing her.
On April 22, 2001, Ybarra arrested D.G. for driving under the influence (DUI). According to D.G., Ybarra was sitting in his patrol car outside a bar when D.G. left the bar. Ybarra followed her for more than a mile and turned on his patrol car's overhead lights when she stopped at her sister's house. D.G. was not concerned at first, because Ybarra had previously pulled her over on a number of occasions to talk to her and ask her to go to lunch. Instead, Ybarra administered field sobriety tests and then arrested D.G. After she posted bond and returned home at 4 a.m., D.G. found Ybarra waiting for her. Ybarra then entered her house without permission. She asked him to leave, indicating that if he did not, she would call the police. Ybarra said, "`I am the police'" and left. He subsequently called D.G. from his patrol car. She told him she had nothing to say and hung up. D.G. said she believed Ybarra was using his authority to intimidate her.
Ybarra told a different version of the events of that evening. Ybarra said he was on patrol when he saw a vehicle make a wide turn. He followed the vehicle and determined it was speeding. Ybarra stopped the vehicle and then learned D.G. was the driver. Ybarra arrested D.G. for DUI and transported her to a police station. Ybarra said he went to D.G.'s home at her request to inform her mother that D.G. had been arrested. He claimed there was a problem with the telephone in the jail. Ybarra said he went to an automatic teller machine to get cash for D.G.'s mother to use to post D.G.'s bond. When he returned, D.G. was present because her bond had already been posted.
A patrol sergeant with the Scottsbluff Police Department testified that the bar D.G. left before being arrested by Ybarra was not on Ybarra's assigned beat on that night. The sergeant did not think it was feasible for Ybarra to have seen D.G. make a wide turn from the point where Ybarra said he was parked at the time. The sergeant said he used the telephone in the jail that night and had no problems. He said he could not believe that an officer would actually bond out his own prisoner. He said there had been several complaints against Ybarra because Ybarra parked at that bar and followed customers after they left.
D.G.'s driver's license was temporarily revoked as a result of the DUI charge. After an administrative license revocation hearing, the revocation proceeding was dismissed by the hearing officer. Ybarra *449 had previously testified in a number of hearings before the same officer. At Ybarra's hearing before the Commission, the revocation hearing officer testified that Ybarra exercised "horrendous judgment" by going to D.G.'s mother's home at 3 a.m. to loan her money to post D.G.'s bond. The officer stated that Ybarra was not credible at the revocation hearing. Ybarra had encouraged the officer not to dismiss the revocation proceeding because it would affect Ybarra's reputation and because he thought the dismissal would jeopardize his credibility as a police officer. The revocation hearing officer said he thought Ybarra was acting as a "rogue cop" and that it appeared Ybarra had been scorned and was trying to get revenge on D.G.
The second incident between Ybarra and D.G. occurred on July 22, 2001. When D.G. called police to her home for a domestic dispute, Ybarra was the first officer to arrive. D.G. said she tried to walk away from Ybarra, but he got in his patrol car and cut her off by driving in front of her. Ybarra grabbed her arm and said he wanted to talk, but D.G. refused and asked to speak to another officer.
D.G. wrote to the Commission to express her concerns about Ybarra. She stated her belief that the protection orders were denied because Ybarra was a police officer. She reported to the chief of police incidents of Ybarra's contacting her without permission, but the complaints were initially ignored. D.G. said she moved out of Nebraska to get away from Ybarra. She believed Ybarra was dangerous, and she feared he would use his authority to his advantage if he were granted a license to practice law.

(b) K.
In December 2002, Ybarra was charged with third degree sexual assault on the complaint of a woman we will refer to as "K." because her last name is not in the record. She worked in the Scotts Bluff County jail and had a sexual relationship with Ybarra for about a month in the fall of 2001.
Concerning the incident leading to the criminal charge, Ybarra stated that he was in the jail after having arrested a drunk driver. He noticed a pack of cigarettes in the left front pocket of K.'s shirt. Ybarra said he thought K. had stopped smoking, so he reached across and grabbed the pack of cigarettes out of the pocket. Ybarra told K. he would get rid of the cigarettes.
A few weeks later, Ybarra was informed that he was being investigated for a sexual assault on K. He was subsequently charged with third degree sexual assault and found not guilty by a jury. Ybarra was scheduled to appear before the Scottsbluff City Council to respond to the accusation, but he decided to resign from his position as a police officer rather than make a public record about the incident.

(c) T.W.
T.W., an attorney in the Scotts Bluff County Attorney's office, dated Ybarra from September 2001 until October 2004. In November 2004, she requested a protection order against him. T.W. said that after she attempted to end the relationship, Ybarra's behavior escalated from emotional abuse and manipulation to stalking. She alleged that his behavior had become increasingly abusive, harassing, and inappropriate at both her home and her office and that she had serious concerns for her physical safety.
In T.W.'s affidavit in support of the protection order, she alleged that she had learned that Ybarra had been unfaithful and had been dating another woman for 6 months. T.W. decided she no longer wanted to speak to Ybarra. Ybarra called T.W.'s home and office telephones incessantly and left messages with office assistants. *450 At one time, Ybarra called T.W.'s office and said that he had an emergency and that T.W. needed to contact him immediately. She did not return the telephone call. T.W. felt it necessary to leave the courthouse or arrange to work outside the office when Ybarra said he was coming to see her there. When T.W. returned to her private office, she found notes from him, including one that said, "I love you! [T.W.]" T.W. said she was forced to have security escorts from her office to her car. After Ybarra sent T.W. an e-mail stating that the relationship was over, Ybarra continued to call her home at all hours of the day and night.
The protection order was granted for 1 year. After it was issued, Ybarra came to T.W.'s office, claiming he needed to discuss child support matters. She was forced to remain in her office while security personnel ensured he had left the building.
In a letter to the Commission, T.W. stated that Ybarra had a history of "abuse, manipulation, violence and predatory behavior that is a serious risk for any vulnerable person, especially any female, who may come into contact with him.... There is no regret, no remorse and absolutely no change in his personal character or behavior."
The victim and witness assistance director for the Scotts Bluff County Attorney's office wrote to the Commission to oppose Ybarra's admission to the bar. The director stated he had assisted three women who were granted domestic abuse protection orders against Ybarra. The director said one of the most disturbing experiences was when Ybarra violated a protection order by making excuses to be in the building where T.W. worked. The director said Ybarra had no regard for the law and felt he was above it.
Ybarra stated that he dated T.W. for 3 years and that the relationship began to deteriorate when he moved to Chadron to attend college. He began a new relationship after he had not heard from T.W. for a time. Ybarra claimed T.W. called him at 1 or 2 a.m. and said she was in Chadron and wanted to see him. He went to her hotel room, where they talked for about an hour. Initially, she would not let him leave. The next day, they had breakfast and eventually had sexual relations. When Ybarra's new girlfriend, A.S., came to the room, T.W. became upset and left. Ybarra claimed T.W. continuously called him at home and at work. Ybarra said he tried to avoid her calls but eventually agreed to meet her at a city park.
When they met, T.W. was crying and upset about Ybarra's seeing another woman. Ybarra claimed that T.W. said she was going to drive her car off the road and that she began stabbing her wrist with a sharp object on her keyring. When he grabbed her to try to stop her, she pulled away and ran. Ybarra apologized and told T.W. he still loved her. They agreed to meet several weeks later, but at that time, T.W. refused to speak to Ybarra. T.W. was then granted the protection order.

(d) A.S.
A.S. began dating Ybarra at Chadron State College. Later, while both were attending the University of Nebraska College of Law, A.S. was granted a domestic abuse protection order against Ybarra. In her supporting affidavit, dated August 1, 2007, A.S. stated that in May, Ybarra found her asleep "next to a male friend." She awoke when Ybarra began stroking her leg. She and Ybarra went into the hallway of the apartment, and Ybarra said he would leave her alone for good if she would have sex with him. When she refused, Ybarra bent A.S. over a staircase and proceeded to touch her vagina and then penetrated her with his penis even *451 though she asked him to stop. She did not report the incident to authorities.
In June 2007, A.S. came home to find Ybarra waiting for her. She was wearing a male friend's T-shirt and shorts, and Ybarra demanded that she take them off. When she did not remove the clothes, Ybarra cut them off with scissors. She began to scream and cry, and Ybarra placed his hands over her nose and mouth to muffle her cries. He then pinned her to the ground until she calmed down and stopped screaming. He prevented her from getting up and threatened to kill her. He said that he did not care if he went to prison and that it would be her fault if he never saw his children again.
On July 29, 2007, A.S. arrived home to find Ybarra in her apartment. To get him out of the apartment, she took him for a drive. He asked her to pull over so they could have sex. A.S. refused, but Ybarra began to grab her breasts. He then tried to grab her face and forcibly kissed her, biting her lip. When she pushed him away with her right arm, Ybarra punched her in the upper arm.
Around August 1, 2007, A.S. reported that Ybarra had entered her apartment without her permission and left flowers and stuffed animals for her. No forced entry was found, and A.S. told police that Ybarra may have had a key to her apartment made without her permission. She believed he had previously entered her apartment and ejaculated on the bedspread.
The protection order was issued on August 1, 2007, and within hours of its issuance, Ybarra arrived at A.S.' residence with a copy of the order in his hand. On August 2, Ybarra was charged with third degree domestic assault, violation of a domestic abuse protection order, and trespassing. Ybarra entered into a plea agreement and was found guilty of first-offense violation of a protection order and first degree criminal trespass. The third degree domestic assault charge was dismissed. He was fined $25. Ybarra completed a 24-week domestic violence intervention program upon the advice of his attorney.
Ybarra's version of events differed. He stated that A.S. attempted to commit suicide when he broke off the relationship. He did not report the suicide attempt because he was concerned it would affect A.S.' ability to finish law school or take the bar examination. Ybarra said A.S. hurt her lip when they were attempting to kiss in the car and bumped into each other. When they returned to her apartment, they fought, and Ybarra grabbed A.S. by the arms because she was swinging at him. Ybarra denied the other incidents.
At the time the protection order was issued, A.S. was working for the Attorney General's office. An investigator for the office wrote to the Commission asking it to deny Ybarra's application. The investigator said he was involved in the investigation of an alleged domestic assault by Ybarra on A.S. That investigation "uncovered a significant history of abhorrent behavior toward women" by Ybarra, including when he was working as a law enforcement officer.

2. OTHER EVIDENCE
At the hearing, Ybarra introduced evidence to support his application, including a letter from the mother of a woman he had dated since July 2008; a letter from the mother of one of his children; a letter from an attorney who employed Ybarra as a law clerk and who had offered him a position after he passes the bar examination; a letter from the child support specialist in the Scotts Bluff County Attorney's office, who indicated that Ybarra *452 was current in his child support obligations; a letter from the dean of students at the University of Nebraska-Lincoln, who stated that Ybarra fulfilled the obligations attached to his student judicial sanctions; and letters of appreciation for his work as a police officer in Scottsbluff. Ybarra denied the allegations of all four women as recounted above, except the violation of the protection order.

3. COMMISSION'S ACTION
After the hearing, the Commission notified Ybarra that it had denied his request to sit for the bar examination. The Commission's decision was based on the admission requirements for the practice of law and the standard of character and fitness.[1] Section 3-103 provides:
An attorney should be one whose record of conduct justifies the trust of clients, adversaries, courts, and others with respect to the professional duties owed to them. A record manifesting a significant deficiency by an applicant in one or more of the following essential eligibility requirements for the practice of law may constitute a basis for denial of admission. In addition to the admission requirements otherwise established by these rules, the essential eligibility requirements for admission to the practice of law in Nebraska are:
(A) The ability to conduct oneself with a high degree of honesty, integrity, and trustworthiness in all professional relationships and with respect to all legal obligations;
(B) The ability to conduct oneself diligently and reliably in fulfilling all obligations to clients, attorneys, courts, and others;
(C) The ability to conduct oneself with respect for and in accordance with the law and the Nebraska Rules of Professional Conduct;
(D) The ability to communicate clearly with clients, attorneys, courts, and others;
(E) The ability to reason, analyze, and recall complex factual information and to integrate such information with complex legal theories;
(F) The ability to exercise good judgment in conducting one's professional business;
(G) The ability to avoid acts that exhibit disregard for the health, safety, and welfare of others;
(H) The ability to use honesty and good judgment in financial dealings on behalf of oneself, clients, and others;
(I) The ability to comply with deadlines and time constraints;
(J) The ability to conduct oneself professionally and in a manner that engenders respect for the law and the profession.
The Commission specifically cited subsections (A), (C), (F), (G), (H), and (J), and Ybarra has appealed from the Commission's decision.

III. ASSIGNMENT OF ERROR
Ybarra contends the Commission erred in failing to find that the evidence established that Ybarra met the standard of character and fitness to sit for the state bar examination.

IV. STANDARD OF REVIEW
Under Neb. Ct. R. § 3-115, the Nebraska Supreme Court considers the appeal of an applicant from a final adverse ruling of the Commission de novo on the *453 record made at the hearing before the Commission.[2]

V. ANALYSIS
The record supports the Commission's denial of Ybarra's application to take the Nebraska bar examination. Ybarra exhibited abusive behavior toward four women with whom he had previous relationships. In each case, the version of events provided by the woman describes Ybarra's actions toward her as intimidating, violent, assaultive, unlawful, perverted, and demonstrating an abuse of his authority. In each instance, Ybarra provides an explanation differing from that given by the woman.
In the DUI incident with D.G., Ybarra followed her from a bar and then stopped her for DUI. He was waiting at her home when she arrived after posting bond. Ybarra claimed he did not know D.G. was the driver until after he stopped the car for making a wide turn and speeding, and he claimed D.G. asked him to contact her mother about bond. In the domestic dispute incident, Ybarra was the first officer to arrive, even though he knew from the address that it was D.G.'s home. Ybarra apparently saw no conflict in answering a police call about a domestic matter at the home of a former girlfriend.
The record contains no statement from K. about the incident in which Ybarra touched her. Ybarra stated that he reached into K.'s shirt pocket to take away her cigarettes, but he was eventually charged with third degree sexual assault for his actions. He resigned from the police department rather than face a public hearing into the matter.
T.W. obtained a protection order against Ybarra for his harassing and inappropriate behavior after she ended their relationship. T.W. said Ybarra continuously called her at home and at the office even after she told him she no longer wanted to speak to him. T.W. said she was forced to change the locks on her home and to get security escorts from her office to her car. Ybarra claimed that T.W. called him at home and at work and that she was upset when he began a new relationship. He alleged that he continued to call T.W. because he was concerned for her safety after she made suicidal statements.
A.S. also obtained a protection order against Ybarra after their relationship ended. She reported incidents of physical violence, including forcible sex. She believed Ybarra had entered her apartment without her permission and ejaculated on her bedspread. Ybarra claimed that he was concerned about A.S.' safety because she was suicidal. He denied the incidents of physical contact, except that he grabbed her by the arms when she was swinging at him.
The incidents with the four women span a time period of over 6 years and occurred in several locations. However, there is a pattern in Ybarra's behavior which appeared to intensify over time. All of the incidents involved women with whom Ybarra had an intimate relationship.
The primary purposes of character and fitness screening before admission to the bar of Nebraska are to [en]sure the protection of the public and to safeguard the justice system.... The public is adequately protected only by a system that evaluates character and fitness as those elements relate to the practice of law. The public interest requires that the public be secure in its expectation that those who are admitted to the bar are worthy of the trust and confidence *454 clients may reasonably place in their attorneys.[3]
The Commission's rules "place on the applicant the burden of proving good character by producing documentation, reports, and witnesses in support of the application."[4] The Nebraska Supreme Court is vested with the sole power to admit persons to the practice of law in this state and to fix qualifications for admission to the Nebraska bar.[5] Neb.Rev.Stat. § 7-102(1) (Reissue 2007) provides: "No person shall be admitted ... unless it is shown to the satisfaction of the Supreme Court that such person is of good moral character." This court has delegated administrative responsibility for bar admissions solely to the Commission.[6]
Where the record of an applicant for admission to the Nebraska State Bar demonstrates a significant lack of honesty, trustworthiness, diligence, or reliability, a basis may exist for denying his or her application.[7] When evidence exists to indicate that an applicant has engaged in conduct demonstrating a lack of character and fitness, the Commission must determine whether present character and fitness qualify the applicant for admission.[8]
"The ultimate test of present moral character, applicable to original admissions to the Bar, is whether, viewing the applicant's character in the period subsequent to his misconduct, he has so convincingly rehabilitated himself that it is proper that he become a member of a profession which must stand free from all suspicion.... That the absence of good moral character in the past is secondary to the existence of good moral character in the present is a cardinal principle in considering applications for original admission to the Bar."[9]
In another bar admission case, we noted that the applicant had been involved in three serious incidents involving "`"abusive, disruptive, hostile, intemperate, intimidating, irresponsible, threatening, [and] turbulent behavior"'" and that such behavior is a proper basis for the denial of admission to the bar.[10] While two of the incidents had occurred 9 years earlier, the most recent had taken place while the applicant was a first-year law student. We concluded that the Commission did not err in determining that the applicant, who had been allowed to take the bar examination, should not be admitted to the bar association.[11]
Ybarra has demonstrated a pattern of behavior involving former female acquaintances. The incidents included in the record took place between 2001 and 2007. Two took place while he was a police officer. In the arrest of D.G., Ybarra continued to perform the DUI investigation even after he learned her identity; he obtained money to pay her bond, an action that was deemed inappropriate by a patrol sergeant with the Scottsbluff Police Department; *455 he arrested someone with whom he had a previous sexual relationship, a violation of the police department's conflict of interest policy; and he arrested D.G. after she left a bar that was not on Ybarra's beat. The administrative license revocation hearing officer believed that Ybarra had acted as a "rogue cop" and found that Ybarra's testimony was not credible.
The record includes little detail about the incident with K., the jail employee, but Ybarra's actions were serious enough to warrant a charge of third degree sexual assault. He was found not guilty by a jury, but he later resigned from his job as a police officer rather than appear at a public hearing before the city council.
Two of the women, T.W. and A.S., obtained protection orders against Ybarra. Ybarra's behavior toward T.W. was increasingly harassing: He continually called her at home and at work, left notes in her private office, and visited her uninvited at the office, leading T.W. to express concern about her physical safety.
Ybarra's actions escalated and became more physical as time passed, becoming more inappropriate after he began law school. It was alleged that Ybarra physically restrained A.S., cut off her clothes, hit her on the arm, bit her on the lip, and sexually assaulted her. Even after being served with a protection order, Ybarra's first response to that order was to go to A.S.' apartment to confront her. Ybarra denies any misbehavior on his part. He even claims two of the women were suicidal over the end of their relationships with him.
The record shows a pattern of improper behavior on the part of Ybarrafour women made claims of assault against Ybarra or sought protection orders against him. In each of the cases, Ybarra denies any wrongdoing and attempts to blame the woman, claiming she was either lying or suicidal, that she was harassing him, or that he was trying to protect her. By his denial, Ybarra takes no responsibility for any of the behavior and shows no remorse for his actions. Indeed, he does not appear to believe that his behavior has been inappropriate.
The only evidence Ybarra presented to suggest that he acknowledges or admits to any problems is his completion of a 24-week domestic violence program, which he undertook on the advice of his attorney. However, Ybarra never admitted that any of the allegations by the four women had a basis in fact. He has not suggested that he has been rehabilitated. While Ybarra has not been charged criminally or convicted of these alleged assaults, the allegations suggest a pattern of conduct toward four different women that is totally unacceptable behavior.
The Commission specifically cited subsections (A), (C), (F), (G), (H), and (J) of § 3-103 as the basis for its decision to deny Ybarra's application to sit for the bar examination. The Commission thus found Ybarra lacked the ability to demonstrate honesty and integrity; to act in accordance with the law and the rules of ethics; to exercise good judgment; to avoid acts that show disregard for the health, safety, and welfare of others; and to conduct himself professionally. The record shows a history of behavior which is abusive, violent, hostile, intimidating, threatening, assaultive, unlawful, and perverted. The record shows that Ybarra does not meet the standards of character required to be admitted to the bar.

VI. CONCLUSION
Ybarra's behavior demonstrates a pattern of abhorrent behavior toward women. Three women in the past 9 years have sought protection orders against him. He *456 has not admitted that his behavior is inappropriate and has not demonstrated any remorse. The Commission was correct in determining that Ybarra does not meet the standards of character required for admission to the bar and that he should not be allowed to take the state bar examination. We affirm the Commission's denial of Ybarra's application to take the Nebraska bar examination.
APPLICATION DENIED.
NOTES
[1] See Neb. Ct. R. § 3-103.
[2] In re Application of Hartmann, 276 Neb. 775, 757 N.W.2d 355 (2008).
[3] Neb. Ct. R. § 3-101 et seq., appendix A.
[4] Id. See, also, In re Application of Hartmann, supra note 2.
[5] In re Application of Hartmann, supra note 2.
[6] Id.
[7] Id.
[8] Id.
[9] In re Application of Majorek, 244 Neb. 595, 605, 508 N.W.2d 275, 282 (1993), quoting In re Application of Allan S., 282 Md. 683, 387 A.2d 271 (1978).
[10] In re Application of Antonini, 272 Neb. 985, 993-94, 726 N.W.2d 151, 157 (2007), quoting In re Application of Silva, 266 Neb. 419, 665 N.W.2d 592 (2003).
[11] In re Application of Antonini, supra note 10.